RECORD NUMBER: 13-4819(L)

# United States Court of Appeals
### *for the*
# Fourth Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

**DUSTIN ALLEN CARTER, RODERICK D. STEVENS, DAYVON BRYAN RILEY,**

*Appellants.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA AT WILMINGTON**

# OPENING BRIEF OF APPELLANTS

**SCOTT BRETTSCHNEIDER**
**Attorney at Law**
**626 RXR Plaza**
**6th Floor, West Tower**
**Uniondale, NY 11556**
**(516) 987-3616**
*Counsel for Appellant Riley*

**G. RYAN WILLIS**
**WILLIS JOHNSON & NELSON, PLLC**
**1101 Haynes Street**
**Suite 205**
**Raleigh, North Carolina 27604**
**(919) 900-7688**
*Counsel for Appellant Carter*

**JAMES C. WHITE**
**LAW OFFICES OF JAMES C. WHITE P.C.**
**P.O. Box 16103**
**Chapel Hill, NC 27516**
**(919) 313-4636**
*Counsel for Appellant Stevens*

COUNSEL PRESS • VA – (800) 275-0668

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................iii

STATEMENT OF JURISDICTION............................................................ 1

ISSUES PRESENTED FOR REVIEW ....................................................... 1

STATEMENT OF THE CASE...................................................................... 2

   Procedural History .................................................................................... 2

   Facts and Rulings Presented for Review ................................................. 3

      A. The Carter Hearing .......................................................................... 4

      B. The Riley Hearing ............................................................................ 5

      C. The Stevens Hearing ........................................................................ 6

SUMMARY OF ARGUMENT .................................................................... 6

ARGUMENT ............................................................................................... 8

   Arguments Concerning All Defendants.................................................... 8

     I.     THE TRIAL COURT ERRED BY SENTENCING THE DEFENDANTS FOR FRAUDULENTLY ACCESSING CREDIT CARD ACCOUNTS WITHOUT ANY EVIDENCE THAT THE ACCOUNTS WERE VALID ........... 8

           Standard of Review ................................................................. 8

           Argument.................................................................................. 8

     II.    THE TRIAL COURT ERRED BY APPLYING A TWO–LEVEL "SOPHISTICATED MEANS" ENHANCEMENT TO EACH DEFENDANT'S SENTENCE WHEN THE ALLEGED CONDUCT WAS ONLY TYPICAL CREDIT CARD FRAUD ...................................................................... 12

i

Standard of Review ............................................................... 12

Argument ............................................................................. 12

Arguments Concerning Dustin Carter ................................... 14

III.    MR. CARTER SHOULD BE RESENTENCED BECAUSE
        THE   SENTENCING   COURT   FAILED   TO
        ADEQUATELY  RESOLVE  A  FACTUAL  DISPUTE
        PROPERLY  RAISED  BEFORE  THE  SENTENCING
        COURT ..................................................................... 14

        Standard of Review & Note Concerning Mr. Carter's
        Appellate Waiver ...................................................... 14

        Argument ................................................................. 14

IV.     MR. CARTER SHOULD BE RESENTENCED BECAUSE
        THE   SENTENCING   COURT   FAILED   TO
        ADEQUATELY  RESOLVE  A  FACTUAL  DISPUTE
        PROPERLY  RAISED  BEFORE  THE  SENTENCING
        COURT ..................................................................... 17

        Standard of Review ................................................... 17

        Argument ................................................................. 17

V.      MR. CARTER SHOULD BE RESENTENCED BECAUSE
        THE SENTENCING COURT FAILED TO FOLLOW THE
        REQUIREMENTS OF 18 U.S.C. § 3553 ............................... 19

        Standard of Review ................................................... 19

        Argument ................................................................. 19

Arguments Concerning Dayvon Riley ................................... 20

VI.     THE DISTRICT COURT COMMITTED REVERSIBLE
        ERROR BY FAILING TO COMPLY WITH MULTIPLE
        PROVISIONS OF FED R. CRIM. P. 32 ............................... 20

A.    The District Court failed to comply with subsection (i)(1)(4) of Fed. R. Crim. P. 32, requiring reversal and remand ..................................................................... 20

Procedural History ................................................... 23

Case Law ................................................................. 24

B.    Did the District Court abuse it's discretion in refusing to grant a continuance of the sentencing despite the violations of Fed.R.Crim.P 32(e)(2), 32(f)(1) and 32(g) that occurred ........................................................ 26

VII.   DEFENDANT WAS DENIED HIS 6TH AMENDMENT RIGHT TO ASSISTANCE OF COUNSEL DUE TO THE INEFFECTIVE ASSISTANCE OF COUNSEL IN FAILING TO OBJECT TO THE RULE 32 VIOLATIONS ... 31

VIII.  THE PLEA AGREEMENT WAS UNKNOWINGLY AND INVOLUNTARILY ENTERED INTO BECAUSE THE DEFENDANT DID NOT FULLY UNDERSTAND THE CONSEQUENCES OF HIS PLEA .......................................... 34

Arguments Concerning Roderick Stevens ................................................ 37

IX.   TRIAL COUNSEL'S FAILURE TO OBJECT TO APPLICATION OF THE SENTENCING GUIDELINES CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL ............................................................................ 37

CONCLUSION ............................................................... 40

REQUEST FOR ORAL ARGUMENT ....................................... 40

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM A

ADDENDUM B

iii

# TABLE OF AUTHORITIES

**Cases:**

*Bradshaw v. Stumpf,*
    545 U.S. 175, 125 S.Ct. 2398, 162 L.Ed 2d 143 (2005) ................... 35

*Brady v. United States,*
    397 U.S. 742 (1970) ............................................................. 35

*Busby v. Holman,*
    356 F.2d 75 (5th Cir. 1966) ................................................. 36

*Gall v. United States,*
    552 U.S. 38 (2007) ....................................... 14, , 15, 17, 19

*Jones v. United States,*
    783 F.2d 1477 (9th Cir.1986) ............................................... 31

*Strickland v. Washington,*
    466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ......... 31, 32, 33

*Tanner v. McDaniel,*
    493 F.3d 1135 (9th Cir. 2007) ........................................... 35

*United States v. Breckenridge,*
    93 F.3d 132 (4th Cir. 1996) ......................................... 37, 38

*U.S. v. Butner,*
    277 F.3d 481 (4th Cir. 2002) ............................................. 10

*United States v. Camacho,*
    348 F.3d 696 (8th Cir. 2003) ............................................. 15

*United States v. Cameron,*
    410 F. App'x 626 (2011) ................................................... 20

*United States v. Carter,*
    564 F.3d 325 (4th Cir. 2009) ................................... 18, 19, 20

iv

*United States v. Casas,*
    425 F.3d 23 (1st Cir. 2005)................................................................ 28

*United States v. Coonce,*
    961 F.2d 1268 (7th Cir. 1992) ........................................................ 15

*United States v. Eschweiler,*
    782 F.2d 1390 (7th Cir. 1986) ................................................... 30

*United States v. Fernandez,*
    877 F2d 1138 (2nd Cir. 1989) ........................................................ 35

*United States v. Forrester,*
    616 F.3d 929 (9th Cir., 2010) ........................................................ 35

*United States v. Henderson,*
    301 F. App'x 256 (4th Cir. 2008) ................................................ 15

*United States v. Jackson,*
    524 F.3d 532 (4th Cir. 2008) ........................................................ 15

*United States v. Kraig,*
    99 F.3d 1361 (6th Cir. 1996) ........................................................ 16

*United States v. Lester,*
    247 F2d 496 (2nd Cir., 1957) ........................................................ 34

*United States v. Lewis,*
    880 F.2d 243 (9th Cir., 1989) ........................................................ 24

*United States v. Lopez-Lopez,*
    295 F.3d 165 (1st Cir, 2002)................................................... 28, 29

*United States v. Masters,*
    2012 WL 5425775 (D. Nev. 2012)................................................ 10

*United States v. McGee,*
    736 F.3d 263 (4th Cir. 2013) ..................................................... 8, 12

*United States v. Mellor*,
    353 F. App'x 875 (4th Cir. 2009).......................................................... 13

*United States v. Milner*,
    2008 WL 199730 (E.D.N.C. Jan. 23, 2008) ...................................... 12

*United States v. Mitchell*,
    243 F.3d 953 (6th Cir, 2001) ........................................................ 25, 26

*United States v. Myers*,
    442 F. App'x 763 (4th Cir. 2011) ...................................................... 18

*United States v. Noel*,
    502 F. App'x 284 (4th Cir. 2012) ...................................................... 16

*United States v. Onyesoh*,
    674 F.3d 1157 (9th Cir. 2012) .......................................................... 10

*United States v. Petty*,
    80 F.3d 1384 (9th Cir. 1996) ................................................. 24, 25, 26

*United States v. Renaud*,
    999 F.2d 622 (2nd Cir. 1993) ........................................................... 35

*United States v. Rone*,
    743 F.2d 1169 (7th Cir. 1984) ......................................................... 30

*United States v. Rushing*,
    392 F. App'x 138 (4th Cir. 2010) ...................................................... 18

*United States v. Sadr*,
    465 F. App'x 278 (4th Cir. 2012) ...................................................... 16

*United States v. Sosa*,
    789 F.2d 1257 (7th Cir. 1986) ......................................................... 30

*United States v. Stevens*,
    851 F.2d 140 (6th Cir, 1988) ........................................................... 25

*United States v. Sustaita*,
     1 F.3d 950 (9th Cir. 1993) ...................................................... 24, 25, 26

*United States v. Wainwright*,
     420 F.2d 898 (5th Cir. 1969) ............................................................ 36

*United States v. Zuber*,
     118 F.3d 101 (2nd Cir. 1997) ............................................................ 29

**Rules, Statutes, and Other Authorities:**

18 U.S.C. § 1029(e) .......................................................................... 9, 10

18 U.S.C. § 1028A .......................................................................... 1, 23

18 U.S.C. § 1349 ................................................................................. 1

18 U.S.C. § 3553 ........................................................................*passim*

18 U.S.C. § 3742(a) ........................................................................... 1

28 U.S.C. § 1291 ................................................................................. 1

Fed. R. Crim. P. Rule 11 .............................................................. 7, 37

Fed. R. Crim. P. Rule 32 ..........................................................*passim*

U.S. Const. Sixth Amendment ............................................... 2, 31, 33

U.S.S.G. § 2B1.1 ..................................................................... 9, 10, 12

## STATEMENT OF JURISDICTION

The district court had jurisdiction over the cases of Dustin Carter, Dayvon Riley, and Roderick Stevens by virtue of 18 U.S.C. § 1349 and 18 U.S.C. § 1028A(a)(1). This Court has jurisdiction by virtue of 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291. Mr. Carter filed a timely Notice of Appeal on October 25, 2013. (J.A. at 228). Mr. Riley filed a timely Notice of Appeal on October 26, 2013. (J.A. at 230). Mr. Stevens filed a timely Notice of Appeal on October 28, 2013. (J.A. at 232). Each Defendant appeals from a final order. (J.A. at 178, 200, 221).

## ISSUES PRESENTED FOR REVIEW

1.  Whether the trial court erred by sentencing the Defendants for fraudulently accessing credit card accounts without any evidence that the accounts were valid.

2.  Whether the trial court erred by applying a two-level "sophisticated means" enhancement to each Defendant's sentence when the alleged conduct was only typical credit card fraud.

3.  Whether the trial court failed to properly resolve a factual dispute raised by Mr. Carter before the trial court.

4.  Whether the trial court failed to adequately address and consider legal arguments raised by Mr. Carter during sentencing.

1

5.      Whether the trial court failed to follow the requirements of 18 U.S.C. § 3553 when it sentenced Mr. Carter.

6.      Whether the trial court erred by failing to comply with Federal Rule of Criminal Procedure 32 when it sentenced Mr. Riley.

7.      Whether Mr. Riley was denied his Sixth Amendment right to assistance of counsel due to the ineffective assistance of counsel during his sentencing hearing.

8.      Whether the plea agreement entered into by Mr. Riley was unknowingly and involuntarily entered into when Mr. Riley did not fully understand the consequences of his plea.

9.      Whether Mr. Stevens was denied his Sixth Amendment right to assistance of counsel due to the ineffective assistance of counsel during his sentencing hearing.

## STATEMENT OF THE CASE

**<u>Procedural History</u>**

On December 20, 2012, a grand jury in the Eastern District of North Carolina returned a six-count indictment charging the Defendants in this case, Dustin Carter, Dayvon Riley, and Roderick Stevens, along with two other men, with one count of Conspiracy to Commit Wire Fraud, two counts of Access Device Fraud and Aiding and Abetting, one count of Unlawful Use of Unauthorized

Access Devices and Aiding and Abetting, one count of Possession of a Means of Identification in Connection With Access Device Fraud and Aiding and Abetting, and one count of Aggravated Identity Theft and Aiding and Abetting. (J.A. at 294).

On October 16, 2013, the district court held a sentencing hearing for each Defendant. (J.A. at 148, 185, 207). After pleading guilty, pursuant to a plea agreement, to one count of Conspiracy to Commit Wire Fraud, Mr. Carter was sentenced to a 78-month term of imprisonment. (J.A. at 219). Mr. Carter filed a timely notice of appeal on October 25, 2013. (J.A. at 228). Mr. Riley was sentenced to a 132 month term of imprisonment, together with a 24 month term of imprisonment to run consecutively thereto. (J.A. at 179). Mr. Riley filed a timely notice of appeal on October 26, 2013. (J.A. at 230). After pleading guilty to one count of Conspiracy to Commit Wire Fraud and one count of Aggravated Identity Theft and Aiding and Abetting, Mr. Stevens was sentenced to a 96-month term of imprisonment. (J.A. at 201). Mr. Stevens filed a timely notice of appeal on October 28, 2013. (J.A. at 232).

## Facts and Rulings Presented for Review

Based on an investigation occurring between 2010 and 2012 the United States Secret Service alleged that a group of men, including each of the Defendants, was engaging in credit card fraud. (J.A. at 294). In essence, the charges against the Defendants alleged that they purchased credit card numbers

3

over the Internet by wiring money to a source outside the United States. *Id.* The credit card numbers were then allegedly embossed onto cardstock to produce fraudulent credit cards. *Id.*

However, the government presented no evidence regarding the validity and/or usability of a majority of the credit card numbers. A total of 1,090 account numbers were seized. *Id.* The evidence presented in the Presentence Investigation Report [hereinafter PSR] of each Defendant indicated that 332 of the credit card numbers were used to make purchases. *Id.* There is *no evidence* presented in the PSR indicating that the remaining 758 credit card numbers were valid and/or used to make fraudulent purchases. Despite this lack of evidence, each Defendant was charged as though all 1,090 credit card numbers were valid. (J.A. at 259, 277-78, 300).

In addition, the PSR of each Defendant alleged that the Defendants' alleged criminal conduct constituted "sophisticated means" despite the typical nature of their activity. (J.A. at 266, 283, 301).

### A. The Carter Hearing

Mr. Carter was sentenced on October 16, 2013. (J.A. at 207). At the outset of his truncated hearing, Mr. Carter's counsel reiterated his objections to the PSR, which had already been presented in writing. (J.A. at 208). His counsel noted, in particular, that Mr. Carter objected to the loss amount calculation and explained in

detail the legal arguments challenging the inclusion of invalid account numbers. (J.A. at 209, 211-12). He also noted his objection to the "sophisticated means" enhancement used to increase Mr. Carter's sentence. (J.A. at 209-11).

The trial court failed to rule on both of these objections, and issued a sentence without resolving the factual disputes raised by Mr. Carter. Mr. Carter was sentenced to a 78-month term of imprisonment (1) without the trial court ever ruling on whether his commonplace fraud constituted "sophisticated means", and (2) without the court first hearing evidence that the credit card accounts he allegedly accessed were even valid accounts. (J.A. at 219). In addition, the trial court issued its sentence without mentioning the sentencing factors set out in 18 U.S.C. § 3553.

### B. The Riley Hearing

At Mr. Riley's sentencing hearing, at no point did the Lower Court asked Mr. Riley if he or defense counsel had read and reviewed the Presentence Report and its addendums and/or revisions. (JA at 148-177). The Lower Court became aware that the Presentence Report had been received by Mr. Riley's defense counsel the day before the hearing (JA at 150), but never addressed Mr. Riley as to whether or not he had received or reviewed the revised Presentence Report. Other than Mr. Riley's defense counsel's written objections to the first Presentence Report (JA at 250), defense counsel did not raise any objections in court to the

timeliness of the report, or the revisions in the report, which increased Mr. Riley's guideline level by 4 points and his potential period of incarceration by sixty (60) months.   See revised Presentence Report (JA at 266).   This revised provision of the Presentence Report is never addressed by the lower court judge, the probation officer or defense counsel.

The lower court, thereafter, sentenced the defendant Riley to a term of incarceration of 132 months, with an additional 24 months consecutive sentence, pursuant to 18 U.S.C. §1028A.

### C. The Stevens Hearing

Mr. Stevens was also sentenced on October 16, 2013. (J.A. at 185). At the sentencing hearing, Mr. Stevens's counsel made no arguments regarding proper application of the Sentencing Guidelines. (J.A. at 192).

## SUMMARY OF THE ARGUMENT

The sentence given to each Defendant should be vacated due to procedural and legal errors committed by the lower court.

Each Defendant was sentenced based on the legal conclusion that invalid credit card accounts should be considered when calculating a loss amount. Caselaw supports the opposite conclusion: that invalid accounts should be *excluded* from this calculation. In addition, each Defendant was sentenced based on the factual error that the alleged criminal activity was conducted through "sophisticated

means", when in fact the activity with which the Defendants were charged, and to which they pled, amounted to no more than common credit card fraud.

Moreover, Mr. Carter's sentence, in particular, should be vacated because the legal arguments raised by his counsel went unaddressed, the factual disputes raised before the trial court went unresolved, and the trial court failed to in any way mention the sentencing factors in § 3553(a). Due to these procedural errors, his sentence is invalid and should be vacated by this Court.

Mr. Riley's sentence of 132 months, plus a consecutive term of 24 months, in addition to the above statements regarding Mr. Carter's sentence, was imposed without ever giving Mr. Riley the opportunity to object to the revised guideline level of the second Presentence Report, filed with the Lower Court and delivered to Mr. Riley's defense counsel on the eve of sentencing.

In failing to inquire as to whether Mr. Riley had received the revised report and addendums or had the opportunity to review same with defense counsel, the Lower Court violated Federal Rules of Criminal Procedure 32(i)(1)(A). Mr. Riley's defense counsel's failure to object to the timeliness of the revised Presentence Report, in violation of Fed.R.Crim.P 32(e)(2), 32(f)(1) and 32(g), effectively denied Mr. Riley of his right to assistance of counsel, and pursuant to Fed.R.Crim.P 11, Mr. Riley's ignorance of the possible consequences of his

pleading guilty to the charges against him rendered his plea involuntary and should be vacated.

Due to the procedural errors and violations of Mr. Riley's constitutional rights, his sentence is invalid and should be vacated by this Court.

Mr. Stevens's sentence should be vacated because his trial counsel's failure to make arguments regarding proper application of the Sentencing Guidelines that could have significantly reduced his sentence deprived him of his constitutional right to counsel.

For these reasons, the Defendants' sentences should be vacated and this consolidated case should be remanded for resentencing.

**ARGUMENT**

**<u>Arguments Concerning All Defendants</u>**

## I.    THE TRIAL COURT ERRED BY SENTENCING THE DEFENDANTS FOR FRAUDULENTLY ACCESSING CREDIT CARD ACCOUNTS WITHOUT ANY EVIDENCE THAT THE ACCOUNTS WERE VALID.

***Standard of Review***

This Court reviews a district court's legal conclusions *de novo*. *United States v. McGee*, 736 F.3d 263, 269 (4th Cir. 2013).

***Argument***

The trial court erred by sentencing the Defendants for using fraudulent credit cards without any evidence that the credit cards were valid. In other words, the trial

court included closed or invalid credit card accounts in its loss calculation. The trial court sentenced each Defendant according to the loss calculation included in each defendant's PSR. (J.A. at 217). The PSR for each Defendant increased the relevant offense level by 14 based on United States Sentencing Guideline Manual § 2B1.1(b)(1)(H) (2001) [the United States Sentencing Guideline Manual is referred to hereinafter as U.S.S.G.], due to an alleged loss amount of between $400,000 and $1,000,000. (*See, e.g.*, J.A. at 300). However, the PSRs – and accordingly the trial court's sentences – misapply U.S.S.G. § 2B1.1(b)(1)(H).

Applying U.S.S.G. § 2B1.1(b)(1)(H) can be a long and convoluted process, as it was in this matter. To aid in this process, this Guideline is accompanied by Application Note 3(F)(i). Application Note 3(F)(i) is a special rule used to calculate loss in cases "involving any counterfeit access device or unauthorized access device." U.S.S.G. § 2B1.1 cmt. n.3(F)(i) (2001). The terms "counterfeit access device" and "unauthorized access device" are defined at U.S.S.G. § 2B1.1, Application Note 9(A). U.S.S.G. § 2B1.1(b)(1) cmt. n.9(A) (2001). Application Note 9(A), in turn, references 18 U.S.C. § 1029(e) for the definition of those respective terms. *Id.* According to 18 U.S.C. § 1029(e)(2) and (3), both "counterfeit access devices" and "unauthorized access devices" are types of "access devices" – a term defined in section (e)(1) of the same statute. 18 U.S.C. § 1029(e)(1)-(3) (2014). The definition of "access device" in § 1029(e)(1) is

9

therefore incorporated into the specific definitions of both "counterfeit access device" and "unauthorized access device." Accordingly, the $500 loss amount contemplated by Application Note 3(F)(i) and applicable to U.S.S.G. § 2B1.1(b)(1)(H) applies *only* to "access devices" as defined in § 1029(e)(1).

In order to qualify as an "access device" for purposes of § 1029(e)(1), the device "must be capable of obtaining money, goods, services, or any other thing of value." *United States v. Onyesoh*, 674 F.3d 1157, 1159 (9th Cir. 2012) (internal quotation marks omitted). "Unauthorized access devices are a subset of access devices, and therefore must be capable of obtaining something of value." *Id.*; *see also United States v. Masters*, 2012 WL 5425775, *3 (D. Nev. 2012) (unpublished) (citing and applying the principle of *Onyesoh* in a non-sentencing context).

As this Court has explained, "[i]n determining the loss amount, a sentencing court may consider relevant conduct that has not been charged and proven at trial, if it is shown by a preponderance of the evidence at sentencing." *U.S. v. Butner*, 277 F.3d 481, 487 (4th Cir. 2002). Before a financial transaction can be added to a loss amount in a conspiracy, it must be connected – by some evidence – to the underlying crime. *Id.* at 488.

Therefore, before a court may consider an "access device" in a loss amount calculation, the government must prove by a preponderance of the evidence that the "access device" was "capable of obtaining something of value."

10

Each Defendant was sentenced as though every one of the 1090 credit card numbers cited by the government was valid. (J.A. at 197, 266, 219). However, the government's evidence – both the PSRs and the evidence presented at sentencing – failed to demonstrate that many of the numbers were valid.

Moreover, the nature of the Defendants' plan supports the contention that many of the credit card account numbers were in fact not useable. As described in the PSR, the Defendants purchased stolen credit card numbers via Internet websites. These sites "offered stolen/compromised account numbers for sale." (J.A. at 294). The Defendants were presumably not the only individuals who could access the sites to purchase credit card numbers. Therefore, as other individuals engaged in the same type of scheme using the same stolen credit card account numbers that the Defendants purchased, the account holder of those cards or banks would presumably identify fraudulent activity on the cards and cancel the accounts. For this reason, a large percentage of the credit card account numbers the Defendants purchased were likely closed by the time the Defendants actually acquired the numbers and created counterfeit cards.

The trial court erred by sentencing each Defendant as though every one of the 1090 credit card accounts cited by the government were valid and useable. The Guidelines and federal caselaw require a different approach: if a credit card number is not valid, it can not be considered an "access device" and can not be

11

included in a loss calculation. The government must prove validity by a preponderance of the evidence. Not only did the government fail to reach this level of proof in this case, it failed to offer *any evidence* concerning the validity of most of the credit card accounts in question. This Court should therefore remand this case for re-sentencing.

## II. THE TRIAL COURT ERRED BY APPLYING A TWO–LEVEL "SOPHISTICATED MEANS" ENHANCEMENT TO EACH DEFENDANT'S SENTENCE WHEN THE ALLEGED CONDUCT WAS ONLY TYPICAL CREDIT CARD FRAUD.

***Standard of Review***

This Court reviews the factual findings underlying a district court's sentencing decision for clear error. *McGee*, 736 F.3d at 269.

***Argument***

The trial court erred by finding that the alleged run-of-the-mill credit card fraud constituted a crime of "sophisticated means." (*See* J.A. at 301).

The Sentencing Guidelines define "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 cmt. n.8(B) (2001). "Courts have held that the sophisticated means enhancement applies when the offense conduct is more complex than the average case." *United States v. Milner*, 2008 WL 199730, *6 (E.D.N.C. Jan. 23, 2008) (unpublished).

The fact that the Defendants purchased stolen credit card information and re-encoded that information on credit card stock does not necessarily make the offense sophisticated. Nor does the fact that the Defendants purchased stolen credit card numbers from Vietnam make this case one of sophisticated means. In some credit card fraud cases, the defendants steal credit card information directly from victim's cards with "skimmer" devices. *See*, *e.g.*, *United States v. Mellor*, 353 F. App'x 875, 877 (4th Cir. 2009) (unpublished). Certainly in an environment where pocket-sized devices are available to secretly lift credit card information, the basic purchase of stolen credit card numbers does not qualify as sophisticated.

The Defendants essentially did what most other criminals engaged in credit card fraud do: they created fraudulent credit cards with stolen credit card numbers to purchase goods at retail establishments. (J.A. at 294-96). And they did not attempt to conceal their criminal conduct in a sophisticated way. The Defendants only attempts at concealment described in the PSR involve their buying birthday cards and greeting cards with gift cards, presumably to create the appearance that they were not engaged in criminal activity. (J.A. at 294). The Defendants in this case did not engage in a scheme that was any more complex or intricate than the average credit card fraud scheme.

13

Therefore, the trial court erred by applying a two-level enhancement for "sophisticated means" when the actual conduct in this case is common credit card fraud. The sentences issued to the Defendants should accordingly be vacated.

## Arguments Concerning Dustin Carter

### III.   MR. CARTER SHOULD BE RESENTENCED BECAUSE THE SENTENCING COURT FAILED TO ADEQUATELY RESOLVE A FACTUAL DISPUTE PROPERLY RAISED BEFORE THE SENTENCING COURT.

***Standard of Review & Note Concerning Mr. Carter's Appellate Waiver***

This Court reviews a sentence for procedural error under an abuse of discretion standard. *Gall v. United States*, 552 U.S. 38, 51 (2007).

Further, it is important to note at the outset of this argument that the government agreed on February 6, 2014 to not seek the enforcement of the appellate waiver Mr. Carter agreed to as part of his plea agreement. Pursuant to an agreement between Mr. Carter and the government, the government's confirmation of this position will be addressed in its brief.

***Argument***

Mr. Carter's sentence should be vacated because the trial court failed to properly resolve a factual dispute raised during the sentencing hearing. For every substantive factual dispute raised during sentencing, the court must "rule on the dispute or determine that a ruling is unnecessary either because the matter will not

affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32 (i)(3)(B).

The Federal Rules of Criminal Procedure specifically note that this requirement applies to factual disputes concerning the presentence report. *Id.* When a defendant claims that portions of a PSR are factually inaccurate, the criminal procedural rules require the sentencing court to either make a finding as to the allegation, or determine that no finding is necessary because challenged fact will not be taken into account in sentencing. *United States v. Coonce*, 961 F.2d 1268, 1277 (7th Cir. 1992). This requirement serves as critical protection of the defendant's due process rights and creates a clear record for appellate review. *Id.*

Mr. Carter raised two factual issues during the sentencing phase at the lower court: (1) the government's erroneous loss calculation, and (2) the improper conclusion that Mr. Carter's criminal act was committed through "sophisticated means". A dispute concerning a loss calculation in a PSR is an issue of fact. *See United States v. Jackson*, 524 F.3d 532, 547 (4th Cir. 2008) (explaining that loss calculation is reviewed for clear error); *United States v. Henderson*, 301 F. App'x 256, 258 (4th Cir. 2008) (unpublished) (considering an undisputed loss amount as a finding of fact); s*ee also United States v. Camacho*, 348 F.3d 696, 700 (8th Cir. 2003).

15

Likewise, the question of whether a defendant used "sophisticated means" is an issue of fact. *See United States v. Sadr*, 465 F. App'x 278, 280-81 (4th Cir. 2012) (unpublished) (reviewing a sentencing adjustment for sophisticated means for clear error); *United States v. Noel*, 502 F App'x 284, 290 (4th Cir. 2012) (unpublished) (reviewing a sentencing adjustment for sophisticated means for clear error); *see also United States v. Kraig*, 99 F.3d 1361, 1371 (6th Cir. 1996).

Regarding the first factual dispute, Mr. Carter objected to the loss calculation used in the PSR. In short, Mr. Carter argued that the calculation used by the government overstated the loss amount for which he should be held responsible by considering "access devices" which were in fact incapable of being used. (J.A. at 305). He raised this objection in writing, in response to the PSR submitted by the government. *Id.* He also raised this objection during his sentencing hearing. (J.A. at 208-12, 215). However, the trial court failed to resolve the dispute concerning the loss calculation. Instead, the court simply acknowledged that Mr. Carter's counsel had concluded his argument and, later in the hearing, accepted the base offense level in the PSR. (J.A. at 212, 217). At no point did the court comply with the requirements of Federal Rule of Criminal Procedure 32 (i)(3)(B).

In a like manner, Mr. Carter disputed the factual issue of whether he used sophisticated means. He raised this issue in writing, through his objection to the

PSR. (J.A. at 306). Further, he reiterated this objection during his sentencing hearing (J.A. at 208-11). As with the question of loss calculation, the sentencing court also failed to resolve this factual dispute, offering only a few questions and stating "uh-huh" in response to defense counsel's argument. *Id.*

Mr. Carter properly raised two factual disputes in his objections to the PSR and reiterated these factual disputes before the trial court. Accordingly, the trail court was required to rule on the disputes or determine that a ruling was unnecessary. Fed. R. Crim. P. 32 (i)(3)(B). The sentencing court did neither in this case. Mr. Carter's objections went unaddressed and his sentence should be vacated as a result.

## IV.  MR. CARTER SHOULD BE RESENTENCED BECAUSE THE SENTENCING COURT FAILED TO ADEQUATELY ADDRESS AND CONSIDER LEGAL ARGUMENTS RAISED BY MR. CARTER AT SENTENCING.

***Standard of Review***

This Court reviews a sentence for procedural error under an abuse of discretion standard. *Gall v. United States*, 552 U.S. 38, 51 (2007).

***Argument***

In the alternative, if the arguments raised by Mr. Carter concerning loss calculation and the appropriateness of a "sophisticated means" enhancement are *not* considered to be factual disputes, then they constitute legal arguments that went wholly unaddressed by the trial court.

17

Procedural due process requires that a sentencing court perform – and place on the record – an individualized assessment of a defendant's case. *United States v. Carter*, 564 F.3d 325, 329-30 (4th Cir. 2009). As part of this individualized assessment, a court must consider the legal arguments put forward by the parties. *Id.* at 328; *United States v. Rushing*, 392 F. App'x 138, 139 (4th Cir. 2010) (unpublished). It must adopt or reject all non-frivolous arguments concerning sentencing. *See United States v. Myers*, 442 F. App'x 763, 766-67 (4th Cir. 2011) (unpublished) (vacating defendant's sentence after lower court failed to address policy argument raised by defendant).

The lower court did not address Mr. Carter's arguments. As explained above, it offered very little response to Mr. Carter's arguments concerning sophisticated means, and no ruling whatsoever concerning his argument regarding loss calculation. If these arguments are considered factual disputes, the court's failure to address them constitutes a violation of the Federal Rules of Criminal Procedure. In the alternative, if these arguments are considered legal arguments, the arguments must be analyzed as part of the "individualized" assessment required by due process. The court's failure to address Mr. Carter's arguments, therefore, made his sentencing hearing procedurally unreasonable. His sentence should be vacated and his case remanded for resentencing.

## V.   MR. CARTER SHOULD BE RESENTENCED BECAUSE THE SENTENCING COURT FAILED TO FOLLOW THE REQUIREMENTS OF 18 U.S.C. § 3553.

### *Standard of Review*

This Court reviews a sentence for procedural error under an abuse of discretion standard. *Gall v. United States*, 552 U.S. 38, 51 (2007).

### *Argument*

The mandate of federal law concerning the § 3553(a) factors is clear: "[t]he court, at the time of sentencing, shall state in open court the reasons for its imposition of the particular sentence." 18 U.S.C. § 3553(c) (2014). As this Court has explained, the trial court "must apply the relevant § 3553(a) factors to the specific circumstances of the case before it." *Carter*, 564 F.3d at 328. This Court has further explained that this "necessary" step in the sentencing process is a required step toward ensuring that every defendant is addressed as an individual and every case as unique. *Id.*

The trial court gave no statement or explanation concerning the § 3553(a) factors during Mr. Carter's hearing. (J.A. at 217-19).

This Court has previously explained that "a talismanic recitation of the § 3553(a) factors without application to the defendant being sentenced does not demonstrate reasoned decision making or provide an adequate basis for appellate

review." *Carter*, 564 F.3d 329; *United States v. Cameron*, 410 F. App'x 626, 627 (2011) (unpublished).

This case falls short of even that insufficient standard. There was *no* recitation of the § 3553(a) factors in Mr. Carter's case. This fails both the word and the spirit of 18 U.S.C. § 3553, and accordingly Mr. Carter's sentence was issued in violation of federal statutory law.

### Arguments Concerning Dayvon Riley

**VI.  THE DISTRICT COURT COMMITTED REVERSIBLE ERROR BY FAILING TO COMPLY WITH MULTIPLE PROVISIONS OF FED R. CRIM. P. 32.**

    **A.  *The District Court failed to comply with subsection (i)(1)(4) of Fed. R. Crim. P. 32, requiring reversal and remand.***

Federal Rules of Criminal Procedure 32(i)(1)(A) states that at sentencing the court, "must verify that the defendant and the defendant's attorney have read and discussed the presentence report and any addendum to the report.

### Procedural History

In the case at bar, the defendant-appellant, Dayvon Riley, entered a plea, pursuant to a memorandum of plea agreement on June 4, 2013. (J.A. at 136). At some point thereafter, the United States Probation Department conducted a presentence investigation and on September 18, 2013, Mr. Riley's defense counsel was served with the Presentence Report.  (J.A. at 234). As of that date, a sentencing date had not, as yet, been set. Thereafter on October 2, 2013, Mr.

Riley's defense counsel timely served objections to the Presentence Report. The Court is asked to note that the offense guideline level established in this Presentence Report, the Report to which defense counsel made his objections, was a level 29, which included a 2 point reduction for acceptance of responsibility, and placed Mr. Riley in a Criminal History Category of "I".

On October 2, 2013, the same date that Mr. Riley's defense counsel filed his objections with the United States Probation Department, a sentencing date of October 16, 2013, was set down by the District Court. Please see Docket Entry 129. (J.A. at 7).

On October 7, 2013, the Government filed a consent motion with the District Court requesting a continuance of sentencing for 30 days, advising the court that the Probation Office did not believe it would have sufficient time to finalize the Presentence Report by the October 16, 2013 sentencing date. (J.A. at 144).   On October 11, 2013, the District Court issued a text order denying the Government's motion to continue. See Docket. (J.A. at 7).

On the eve of sentencing, to wit, October 15, 2013, Mr. Riley's defense counsel was emailed a revised Presentence Report, which included a two page addendum which addressed some of the defendant's objections, but, more importantly, in the body of the Presentence Report itself, which otherwise appears to have been unchanged, the offense level guideline calculation was changed from

a 29 to a 33. Such a change increased Mr. Riley's potential guideline levels from 87-108 months to 135-168 months – a five year increase at either end of the guideline.

At the sentencing hearing the following day, the court asked Mr. Riley if he wished to say anything about his sentence, whereafter Mr. Riley apologized for his actions and to his family. (J.A. at 149). Thereafter, there appears to be some confusion on the Lower Court Judge's part as to the guideline range, wherein initially he thinks it is a level 31 and he is corrected by defense counsel, who states "Your Honor, you may be looking at an older version of the PSR. I received a copy yesterday that indicated Level 33." (J.A. at 150). At this point in time, the lower court Judge was effectively alerted to the fact that there had been some change in the Presentence Report. However, at no point in the sentencing hearing does the trial court ask the Defendant if he has read the Presentence report and the addendums and/or revisions thereto, or reviewed same with his attorney.

Without being asked by the trial court, defense counsel begins to speak to the court about the objections he had previously submitted to the first Presentence Report, regarding paragraphs 42, 43 and 47 of the Presentence Report, but is cut off by the lower court judge who advises him that " You better throw the shovel over and get it out of the ditch because the ditch is getting deeper…" (J.A. at 152). At this point, defense counsel advises the lower court that his objections were

22

noted in writing and then defense counsel moves on to discussing the enhancement for Mr. Riley's role in the offense, again, an objection made to the initial Presentence Report, which would have been paragraph 47 in both reports and remained unchanged. It should be noted that paragraphs 42 and 43 differ in the 1st and 2nd Presentence Report and it is Paragraph 43 of the revised report, provided to defense counsel the evening before sentencing and never provided to the defendant, that raises the guideline level by 4 points and increases Mr. Riley's possibility of incarceration by an additional five years. (JA at 152-155). This provision of the Presentence Report is never addressed by the lower court judge, the probation officer or defense counsel.

At no point does the lower court ever ask the defendant of defense counsel if they have read and reviewed the Presentence Report and its addendums and/or revisions. The lower court, thereafter, sentenced the defendant Riley to a term of incarceration of 132 months, with an additional 24 months consecutively, pursuant to 18 U.S.C. §1028A. (JA at 175).

Given the timeliness of the delivery of the second, revised Presentence Report and Addendums on the eve of the sentencing, it was not in any way implied that Mr. Riley had the opportunity to review the Presentence Report. The objections made by defense counsel at the sentencing were the objections previously submitted by defense counsel on October 2, 2013, in response to the

23

initial Presentence Report and were referenced as such in the sentencing. That defense counsel did not a) object to the timeliness of the second Presentence Report and Addendum; b) request a continuance for the opportunity to review the Presentence Report; or c) make an objection to the increased guideline level, increasing Mr. Riley's potential punishment by an additional 5 years, all are elements of ineffective assistance of counsel, which are addressed in a later argument. The District Court, however, failed in its responsibility under Fed. R. Crim. P. 32(i)(1)(A) to ascertain if the defendant had had the opportunity to read and review the Presentence Report and any addendum to the report, and committed reversible error in failing to do so. As such, the sentence should be vacated and remanded.

**Case Law**

In *United States v. Petty*, 80 F.3d 1384 (9th Cir. 1996), the Court held that with regard to Rule 32(c)(3)(2)*, "The plain language of [the rule] requires that the court determine whether or not the defendant and his counsel have had the opportunity to read and discuss the report. *United States v. Lewis*, 880 F.2d 243, 245 (9th Cir., 1989)." (* The current provision of the Rule is 32(i)(1)(a), but contains the same provisions). In distinguishing *Lewis*, the *Petty* court held that while the court in *Lewis* found compliance because defense counsel asserted that the defendant had read the report and did not object, the court in *United States v.*

24

*Sustaita*, 1 F3d 950 (9th Cir, 1993), in contrast found that "defense counsel's statement to the court that '[the] objection that we have filed…that we feel is appropriate' was insufficient to establish that defendant had read the presentence report. *Id* at 953 (emphasis in original)". *United States v. Petty*, *supra*.

In the present case, there is absolutely no indication that Mr. Riley read, or for that matter, even received the untimely report. As in *Petty*, *supra*, the timing of the receipt of the revised Presentence Report by defense counsel, namely, on the eve of the sentencing, especially considering that Mr. Riley was incarcerated at the time, suggests that he did not have the opportunity to do so. In fact, Mr. Riley's own comments at the hearing (J.A. at 175-176) defendant questions the court, "How much time?" and thereafter, "…and now I'm looking at 10 years?", when, in actuality, Mr. Riley had just been sentenced to 13 years, suggests he was completely unaware of the additional time added by the elevated guideline in the revised Presentence Report.

Along the lines of *Petty*, the 6th Circuit, in *United States v. Mitchell*, 243 F.3d 953 (6th Cir, 2001), holds that the District Court must, " 'verify that the defendant and the defendant's counsel have read and discussed the presentence report.' The district court need not make an affirmative inquiry so long as it can somehow determine that defendant's counsel have read and discussed the report. *See United States v. Stevens*, 851 F2d 140, 143 (6th Cir, 1988)."

As in the *Mitchell* case, the hearing transcript in the present case does not, in any way, demonstrate that Mr. Riley and his counsel read and discussed the report. While the colloquy at sentencing seems to indicate the defendant's counsel had reviewed the report and made objections to it, a careful review of counsel's arguments shows that he is referencing the initial Presentence Report received by him on September 18, 2013, and his written objections made thereto and not the revised Presentence Report given to him on the eve of the sentencing, which revised report elevated defendant-appellants guideline level by 4 points.

In the *Mitchell*, *Petty* and *Sustaita*, cases, *supra*, the courts have consistently held that the district court has a duty to determine that defendant and defendant's counsel had an opportunity to read and discuss the Presentence Report and the failure of the district court to do so requires resentencing.

> **B.    *Did the District Court abuse it's discretion in refusing to grant a continuance of the sentencing despite the violations of Fed.R.Crim.P 32(e)(2), 32(f)(1) and 32(g) that occurred.***

The relevant portions of the Federal Rules of Criminal Procedure are as follows:

"Rule 32. Sentencing and Judgment

(e) Disclosing the Report and Recommendation

(2) Minimum Required Notice. The probation officer must give the presentence report to the defendant, the defendant's attorney and an attorney for

the government at least 35 days before sentencing unless defendant waives the minimum period.

(f) Objecting to the Report.

(1) Time to Object. Within 14 days after receiving the presentence report, the parties must state in writing any objections including objections to material information, sentencing guideline ranges, and policy statements contained in or omitted from the report.

(g) Submitting the Report. At least 7 days before sentencing the probation officer must submit to the court and to the parties the presentence report and an addendum containing any unresolved objections, the grounds for those objections, and the probation officer's comments on them."

In the first instance, the initial Presentence Report was delivered to Mr. Riley's defense counsel on September 18, 2013. At that time, a sentence date had not been set. On October 2, 2013, a sentence date of October 16, 2013 was set by the district court, which date automatically violated provision 32(e)(2) of Fed. R. Crim. P. as it was less than 35 days from the delivery of the Presentence Report to defense counsel, let alone the incarcerated Mr. Riley.

The second Presentence Report and addendum to the first Presentence Report were filed with the lower court (and served upon defense counsel) on October 15, 2013 in violation of provision 32(g) of the Fed. R. Crim. P.

27

The fact that the PSR itself was revised and included and upward modification of Mr. Riley's guideline level, triggered defendant's rights to object thereto and as sentencing proceeded the following day, provision 32(f)(1) giving defendant 14 days to object to elements of the Presentencing report including "objections to…sentencing guideline ranges…" was violated.

The government attempted to resolve the potential violations of the time constraints regarding the Presentencing Reports in its motion requesting a continuance of the sentencing, however, the district court Judge, despite the government's contention that the Probation Department would not have enough time to submit the Presentence Report in a timely fashion, not only refused to grant the continuance, but scheduled the sentencing hearing in the first instance in violation of the minimum required notice requirements of Fed.R.Crim.P 32(e)(2).

Failing to give the defendant time to address to the added points to his guideline level, effectively subjected the defendant to an additional five years in prison, without so much the benefit of objecting to the increase.

In reviewing a district court's failure to grant a continuance, "We ordinarily review the district court's failure to continue the sentencing hearing for abuse of discretion." *United States v. Lopez-Lopez*, 295 F3d 165, 169 (1st Cir, 2002). In *United States v. Casas*, 425 F3d 23 (1st Cir., 2005), the First Circuit held that "The time limits found in Rule 32(e) and its predecessor 'are no mere technicalities; they

are integral to the fair and orderly process of imposing sentences. They are mandatory and we expect compliance with them.' " quoting *United States v. Lopez-Lopez, supra*.

The *Casas* case and the case at bar are distinguished from *United States v. Zuber*, 118 F3d 101 (2nd Cir. 1997), wherein the court rejected defendant's contention that the district court erred in denying his motion to continue the sentence hearing, as, there, the court assured the defendant that it would not consider any material contained in the untimely filed supplemental Presentence Report. Herein, that is not the case. The Probation Department substantially revised the Presentence Report, in that it elevated the guideline offense level from a 29 to a 33, which increased the defendant's sentencing guidelines from 87-108 months to 135-168 months. (In that the district court granted the defendant an additional point reduction for his timely acceptance of responsibility, the offense levels would actually be a 28 and 32 respectively, with sentencing guidelines of 78-97 and 121-151, respectively). Such an error cannot, therefore, be considered harmless. The district court relied on and sentenced the defendant based on the elevated offense and guideline levels included in the revised Presentence Report submitted on the eve of the sentencing. Defendant-Appellant Riley was entitled to receive the revised Presentence Report, have the opportunity to read it, review it with his attorney and object to the changes contained therein. The timing of the

delivery of the Presentence Report and addendum annexed thereto was a blatant violation of Fed.R.Crim.P 32(e), and the District Court's refusal to grant a continuance of sentence was an abuse of discretion.

The gist of the matter is perhaps best summed up by the court in *United States v. Sosa*, 789 F.2d 1257 (7th Cir. 1986), wherein the court, in addressing the Rule 32 violations that took place stated that:

"These defendants are concededly guilty. The sentences imposed by the trial judge, even under the faulty process used, may, nevertheless, be appropriate as the sentences were not without some support in the record. However, without following the dictates of Rule 32, there can be no assurance of that. It is necessary here, as with other things, that there be the appearance as well as the reality of fairness. See *United States v. Rone*, 743 F.2d 1176 1169 (7th Cir. 1984) (Edwards, J. concurring). Nor can these significant concerns with sentencing be ameliorated by application of the 'harmless error rule.' See *United States v. Eschweiler*, 782 F.2d 1390, 1390-91 (7th Cir. 1986). These violations of Rule 32 require a remand for resentencing."

Accordingly, given the numerous Rule 32 violations, defendant Riley's sentence must be vacated and the matter remanded for resentencing.

## VII. DEFENDANT WAS DENIED HIS 6TH AMENDMENT RIGHT TO ASSISTANCE OF COUNSEL DUE TO THE INEFFECTIVE ASSISTANCE OF COUNSEL IN FAILING TO OBJECT TO THE RULE 32 VIOLATIONS.

The Sixth Amendment to the United States Constitution affords individuals, among other things, the right to "have the Assistance of Counsel for his defense". In this regard, "The sixth amendment guarantees a criminal defendant the right to effective assistance of counsel". *Strickland v. Washington*, 466 U.S. 668, 686-87, 104 S.Ct. 2052, 2063-64, 80 L.Ed.2d 674 (1984). This right applies both at trial and at sentencing. See *Jones v. United States*, 783 F.2d 1477, 1482 (9th Cir.1986). The appellant must show that the attorney's performance was not in accord with prevailing professional norms, and that the attorney's deficient performance prejudiced him. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.

In the matter at bar, as stated earlier in this brief, Mr. Riley's defense counsel did not a) object to the timeliness of the second Presentence Report and Addendum; b) request a continuance for the opportunity to review the Presentence Report; or c) make an objection to the increased guideline level, which increased Mr. Riley's potential punishment by an additional 5 years.

The errors made by defense counsel cannot be deemed strategic in nature. It was not part of defense counsel's strategy at sentencing, in hopes to mitigate Mr. Riley's actions, that he neglected to take the above actions. Federal Rule of

Criminal Procedure was blatantly violated in several respects, and defense counsel never made any mention of it. He did not object initially, when the district court scheduled the sentencing date on October 16, 2013, which was less than 35 days after he had received the Presentence Report. Nor did he object at the sentencing when, having been given a revised Presentence Report on the eve of sentencing, which report elevated Mr. Riley's criminal offense level by 4 points, subjecting Mr. Riley to an additional 5 years in prison. Finally, defense counsel did not ask for a continuance of the judge at the sentencing in order to have time to make objections to the elevated guideline levels. In fact, when he attempted to inform the court what Mr. Riley's objections were (based on the initial Presentence Report), the lower court advised defense counsel that, in essence, he was making things worse for his client and that he "better throw the shovel over and get it out of the ditch because the ditch is getting deeper…", at which point, defense counsel respectively referred to his written objections.

The two pronged approach adopted by *Strickland* in determining ineffective assistance of counsel as delineated above is that defendant show that counsel's performance was deficient and that the defendant was prejudiced as a result of the deficiency. In the case at bar, both prongs of the *Strickland* test are met. Counsel's failure to object to the blatant violations of Federal Rule, satisfies the deficient performance prong.

With regard to the prong of *Strickland* regarding prejudice to the defendant, defendant was sentenced to a term of imprisonment of 132 months. That sentence exceeded what he would have received under the guidelines of the initial Presentence Report by nearly 3 years, if the lower court sentenced him at the maximum end of the guidelines and by 4 and ½ years if he had been sentenced at the lower end.

The enhancement that increased the defendant's offense level by 4 points had to do with the amount of victims involved in the offense. In reading the Federal Sentencing Guidelines, the definition of victims is such that the Government's calculation of the number of victims could have and should have been challenged lessening the offense level put forth in the Presentence Report. Failure to give the defendant the opportunity to challenge these elevated numbers effectively denied him of his right to due process. In this regard, the ineffectiveness of counsel's representation was highly prejudicial to the defendant.

In that defendant was denied his Sixth Amendment right to assistance of counsel, due to the ineffective assistance of defense counsel, the sentence should be vacated and the matter should be remanded to the lower court.

## VIII.   THE PLEA AGREEMENT WAS UNKNOWINGLY AND INVOLUNTARILY ENTERED INTO BECAUSE THE DEFENDANT DID NOT FULLY UNDERSTAND THE CONSEQUENCES OF HIS PLEA.

In *United States v. Lester*, 247 F2d 496, (2nd Cir., 1957), the Court held that the "Requirements of Rule 11 that plea of guilty shall not be accepted unless voluntary is not satisfied if plea is entered by one who is not fully aware of the consequences of his plea."

The plea agreement was drawn up by the government and forwarded to defense counsel sometime in May of 2013. Defendant's attorney, did not visit the defendant, who was incarcerate at the time, to review the plea agreement, but instead, had an associate of his, who, at the time was not admitted to practice law in the State of North Carolina, bring the plea agreement to the institution where the defendant was incarcerated, to have the defendant sign the agreement. The defendant did not review the agreement with his attorney. Thereafter, defense counsel's associate gave the signed document to defense counsel who then signed it and forwarded it to the government. Thereafter the attorney for the government signed the agreement and on June 4, 2013, a change of plea hearing was held in district court.   During plea allocution, the district court judge briefly described the charges that defendant was pleading to and advised the defendant of the statutory maximum sentences and fines that went along with those charges. (J.A. at 122-123).

34

As such, defendant entered his plea with the belief that his base guideline level, given the highest pled to offense, was a level 7. Defendant was never apprised by counsel, the government or the lower court judge, that the base guideline level was subject to enhancements that could greatly affect his guideline levels and in turn, his possible period of incarceration.

Rule 11 is "designed to ensure that a defendant's plea of guilty is a voluntary and intelligent choice among the alternative courses of action open to the defendant." *United States v. Renaud*, 999 F2d 622 (2nd Cir., 1993). The Second Circuit has also held that "[At] bottom, the colloquy required by Rule 11 is meant to ensure that the defendant is aware of the consequences of his plea." *United States v. Fernandez*, 877 F2d 1138 (2nd Cir. 1989).

"A guilty plea operates as a waiver of important rights, and is valid, only if done voluntarily, knowingly and intelligently, with 'sufficient awareness of relevant circumstances and likely consequences.'" *Bradshaw v. Stumpf*, 545 U.S. 175, 183, 125 S.Ct. 2398, 162 L.Ed 2d 143 (2005), citing *Brady v. United States*, 397 US 742, 748 (1970).

"A failure to ensure that a defendant understands his range of exposure may violate the requirement that a guilty plea be 'knowing and voluntary'". *United States v. Forrester*, 616 F.3d 929, 938 (9th Cir., 2010), citing *Tanner v. McDaniel*, 493 F.3d 1135, 1146 (9th Cir., 2007).

In *United States v. Wainwright*, 420 F2d 898 (5th Cir., 1969), the Court, in citing *Busby v. Holman*, 356 F2d 75, 78 (5th Cir, 1966) held that "it is well settled that a conviction, whether in state or federal court, which is based upon an involuntary or coerced plea of guilty, whether it be unfairly obtained, *given through ignorance*, fear or inadvertence, is invalid as inconsistent with due process of law." (Emphasis added).

In reviewing the plea agreement, the plea minutes, the presentencing report and the sentencing minutes, it is clear that the defendant was ignorant of the possible consequences of his plea, and thus, entered same involuntarily. Defendant entered a plea of guilty believing his base offense guideline was a level 7, which given a criminal history category of I, amounted to a guideline level of 0-6 months. Nowhere in the plea agreement or the sentencing did the government or the lower court judge outline the amount of money or the number of victims the defendant was pleading to, so as to allow defendant to make a truly informed plea. Not until the eve of sentencing was the entirety of the consequences of his plea made known to defense counsel. In that defendant was unapprised of the final numbers until the actual sentencing itself, defendant was completely ignorant of the consequences of his plea until he was sentenced to 132 months, plus an additional 24 month consecutive term.

As such, defendant's guilty plea should be vacated as the district court failed to adequately ensure that the plea was voluntarily entered into pursuant to Rule 11 of the Federal Rules of Criminal Procedure.

### Arguments Concerning Roderick Stevens

## IX.  TRIAL COUNSEL'S FAILURE TO OBJECT TO APPLICATION OF THE SENTENCING GUIDELINES CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL.

Although Mr. Stevens's plea agreement contains an appeal waiver, he expressly reserved his right to appeal "based upon grounds of ineffective assistance of counsel."   (JA at 111).   Mr. Stevens's trial counsel failed to make arguments regarding improper application of the Sentencing Guidelines that could have significantly reduced his sentence, depriving him of his constitutional right to effective assistance of counsel.   (*See* JA at 192).

In *United States v. Breckenridge*, 93 F.3d 132 (4th Cir. 1996), this Court held that "[t]he failure of counsel to object to an improper application of the sentencing guidelines may amount to ineffective assistance of counsel."   *Id.* at 136.   In *Breckenridge*, although the defendant's trial counsel made various arguments that the defendant's sentence was unconstitutional, counsel failed to argue that the defendant's prior convictions were related and thus should not be counted separately to subject him to sentencing as a career offender.   *Id.* at 135. The Court held that counsel's failure to make such argument constituted

inadequate representation, *id.* at 138, and remanded the case to allow the trial court to consider the argument, since acceptance of the argument would have significantly reduced the defendant's sentence, *id.* at 140.

Here, Mr. Stevens's trial counsel failed to advance two arguments that, if accepted, would have resulted in an applicable Guideline range for Count One that was lower than the sentence that Mr. Stevens ultimately received for that Count. The Guidelines application contained in Mr. Stevens's PSR calculated a base offense level of 28 and criminal history category of II, resulting in a Guideline range of 87 to 108 months. (JA at 284). Mr. Stevens was ultimately sentenced to a downward variance of 72 months on Count One. (JA at 197).

Pursuant to section 2B1.1(b)(1)(H) of the Sentencing Guidelines, Mr. Stevens's PSR increased his base offense level by 14 based on a loss of more than $400,000. (JA at 278). The PSR found Mr. Stevens accountable for a loss of $407,611.65 relying on the following: (1) $56,044.86 of *actual charges* on account numbers seized on March 7, 2012; (2) $1,566.79 of *actual charges* on account numbers seized on October 12, 2012; (3) $323,000 estimated at $500 per account for 646 account numbers "that had charges of less than $500 or no charges at all" seized on March 7, 2012; and (4) $27,000 estimated at $500 per account for 54 account numbers "that had charges of less than $500 or no charges at all" seized on October 12, 2012. (JA at 278). The latter two calculations of loss were

38

estimated at $500 per account based on Application Note 3(F)(i) to Guidelines section 2B1.1, which provides that loss "shall be not less than $500 per access device."   U.S.S.G. §2B1.1 n.3(F)(i).

As discussed in more detail above, the Government failed to meet its burden to show that up to 700 account numbers seized from Mr. Stevens on which no charges had been made in fact qualified as "access devices" that were actually "capable of obtaining something of value"—in other words, that were not cancelled or closed. *See supra* § I. If as few as 16 of those account numbers were closed and not usable, the loss attributable to Mr. Stevens would have dropped by $8,000, bringing the total loss below $400,000 and therefore reducing his base offense level by as many as 2 levels pursuant to section 2B1.1(b)(1).

Similarly, an objection to application of a 2 level increase for sophisticated means, as discussed further above, could have reduced Mr. Stevens' base offense level by 2 points. *See supra* § II.

Assuming a minimum decrease of 4 levels in Mr. Stevens's base offense level for Count One to 24, the applicable Guideline range would have been 57 to 71 months—below the 72 months to which Mr. Stevens was ultimately sentenced. Accordingly, Mr. Stevens was prejudiced by trial counsel's failure to present these objections to application of the Guidelines during sentencing.

39

## CONCLUSION

For the foregoing reasons, the Defendants in this matter, Dustin Carter, Dayvon Riley, and Roderick Stevens, respectfully request that their sentences be vacated. This consolidated case should be vacated and this case should be remanded to the sentencing court for resentencing.

## REQUEST FOR ORAL ARGUMENT

Because of the significance of the issues presented in this appeal, Mr. Carter, Mr. Riley, and Mr. Stevens respectfully request that oral argument be granted in this case.

Respectfully submitted this 10th day of February, 2014.

*/s/ G. Ryan Willis*
G. Ryan Willis
State Bar No. 33004
Drew Nelson
State Bar No. 34129
Attorneys for Dustin Carter
Willis Johnson & Nelson PLLC
1101 Haynes Street, Suite 205
Raleigh, NC 27604
daniel@wjnpllc.com
T: 919-900-7668
F: 919-900-7669

*/s/ James C. White*
James C. White, N.C. Bar 31859
Michelle M. Walker, N.C. Bar 41664
Attorneys for Roderick D. Stevens
Law Office of James C. White, P.C.
4819 Emperor Blvd., Suite 400

Durham, NC 27703
jimwhite@jcwhitelaw.com
T: 919-246-4676
F: 919-246-9113

*/s/ Scott Brettschneider, Esq.*
Scott Brettschneider
State Bar No. 2136034
Attorney for the Dayvon Riley
626 RXR Plaza,
6th Floor, West Tower
Uniondale, N.Y. 11556
scottfreelaw@aol.com
T: 516-398-8870
F: 516-522-2699

40

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**No.** 13-4819(L    **Caption:** US v. Carter, Stevens, Riley

### CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

   This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [✓] this brief contains _____9,383_____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [ ] this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [✓] this brief has been prepared in a proportionally spaced typeface using
   MS Word 2010 _____ [*identify word processing program*] in
   Times New Roman, 14 point _____ [*identify font size and type style*]; **or**

   [ ] this brief has been prepared in a monospaced typeface using
   _____ [*identify word processing program*] in
   _____ [*identify font size and type style*].

(s) G. Ryan Willis _____

Attorney for appellant Carter _____

Dated: 2/10/14 _____

# CERTIFICATE OF SERVICE

I certify that on <u>2/10/14</u> the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

JENNIFER MAY-PARKER
OFFICE OF THE U.S. ATTORNEY
310 New Bern Avenue
Suite 800
Raleigh, NC 27601
(919) 856-4292
Counsel for Appellee

<u>/s/ G. Ryan Willis</u>
Signature

<u>2/10/14</u>
Date

ADDENDUM A

410 Fed.Appx. 626
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also Fourth
Circuit Rule 32.1 (Find CTA4 Rule 32.1)
United States Court of Appeals,
Fourth Circuit.

UNITED STATES of America, Plaintiff–Appellee,
v.
Antonio CAMERON, Defendant–Appellant.

No. 10–4096.    |    Submitted: Dec.
20, 2010.    |    Decided: Feb. 9, 2011.

**Synopsis**

**Background:** Following remand for resentencing on his
conviction for possession of 15 or more counterfeit and
unauthorized access devices and aggravated identity theft,
340 Fed.Appx. 872, the United States District Court for the
Eastern District of North Carolina, Terrence W. Boyle, J.,
sentenced defendant to 84 months' imprisonment. Defendant
appealed sentence.

**Holdings:** The Court of Appeals held that:

[1] sentence of 84 months was procedurally reasonable, and

[2] sentence of 84 months was substantively reasonable.

Affirmed.

West Headnotes (2)

[1]    **Sentencing and Punishment**
⬥ Sufficiency

**Sentencing and Punishment**
⬥ Proceedings

**Sentencing and Punishment**
⬥ Sufficiency

Sentence of 84 months' imprisonment
for defendant convicted of possession of
15 or more counterfeit and unauthorized
access devices and aggravated identity theft
was procedurally reasonable, notwithstanding
defendant's argument that trial court did
not follow proper procedure in imposing
upward variant sentence, provide individualized
assessment under statutory sentencing factors,
or adequately support upward variance. 18
U.S.C.A. § 3553(a).

[2]    **False Pretenses**
⬥ Sentence and punishment

Sentence of 84 months' imprisonment for
defendant convicted of possession of 15 or more
counterfeit and unauthorized access devices
and aggravated identity theft was substantively
reasonable.

**\*627** Appeal from the United States District Court for the
Eastern District of North Carolina, at Raleigh. Terrence W.
Boyle, District Judge. (5:07–cr–00331–BO–1).

**Attorneys and Law Firms**

Rudolph A. Ashton, III, McCotter, Ashton & Smith, P.A.,
New Bern, North Carolina, for Appellant. John Stuart Bruce,
Acting United States Attorney, Anne M. Hayes, Jennifer
P. May–Parker, Assistant United States Attorneys, Raleigh,
North Carolina, for Appellee.

Before WILKINSON, MOTZ, and SHEDD, Circuit Judges.

**Opinion**

Affirmed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this
circuit.

PER CURIAM:

Antonio Cameron appeals the eighty-four-month sentence
imposed after we remanded his case for resentencing in
accordance with 18 U.S.C. § 3553(a) (2006), and *United*

*States v. Carter,* 564 F.3d 325 (4th Cir.2009). On appeal, Cameron argues that the sentence imposed on remand was procedurally unreasonable because the district court did not follow proper procedure in imposing an upward variant sentence, provide an individualized assessment based on the § 3553(a) factors and the facts of the case, or adequately support the upward variance. Cameron also contends that the district court erred in not limiting its inquiry to the appropriateness of an upward departure based on the Government's motion. Finding no reversible error, we affirm.

In fashioning a sentence, the district court must first calculate the proper sentencing range prescribed by the Guidelines. *Gall v. United States,* 552 U.S. 38, 49, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007). The court must then consider that range in light of the parties' arguments regarding the appropriate sentence and the factors set out in § 3553(a) before imposing its sentence. *Id.* at 49–50, 128 S.Ct. 586. If the court determines that a sentence outside the applicable sentencing range is appropriate, "the court's stated reasons for [imposing such a sentence] must be sufficiently compelling to support the degree of the variance." *United States v. Lewis,* 606 F.3d 193, 201 (4th Cir.2010) (internal quotation marks omitted). "[A] major departure should be supported by a more significant justification than a minor one." *Gall,* 552 U.S. at 50, 128 S.Ct. 586.

Because Cameron properly preserved his claims, we review for reasonableness under an abuse of discretion standard, reversing unless any sentencing error was harmless. *United States v. Lynn,* 592 F.3d 572, 576, 578 (4th Cir.2010); *see Gall,* 552 U.S. at 46, 128 S.Ct. 586. First, we must ensure that the district court did not commit any "significant procedural error," such as failing to properly calculate the applicable Guidelines range, failing to consider the § 3553(a) factors, or failing to adequately explain the sentence. *Gall,* 552 U.S. at 51, 128 S.Ct. 586. The district court is not required to "robotically tick through § 3553(a)'s every subsection." *United States v. Johnson,* 445 F.3d 339, 345 (4th Cir.2006). However, "a talismanic recitation of the § 3553(a) factors without application to the defendant being sentenced does not demonstrate reasoned decisionmaking or provide an adequate basis for appellate review." **\*628** *Carter,* 564 F.3d at 329. Rather, the district court "must place on the record an 'individualized assessment' based on the particular facts of the case before it. This individualized assessment need not be elaborate or lengthy, but it must provide a rationale tailored to the particular case at hand and adequate to permit 'meaningful appellate review.' " *Id.* at 330 (quoting *Gall,* 552 U.S. at 50, 128 S.Ct. 586) (internal footnote omitted). Further, in imposing a variant sentence, the district court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall,* 552 U.S. at 50, 128 S.Ct. 586.

Once we have determined there is no procedural error, we must then consider the substantive reasonableness of the sentence, taking into account the totality of the circumstances. *Id.* at 51, 128 S.Ct. 586. We may not presume an outside-Guidelines sentence is unreasonable. *Id.* "[We] may consider the extent of the deviation, but must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." *Id.*

 [1]  [2]  Keeping the above standards in mind, we conclude that the district court did not err in declining to limit its inquiry to the appropriateness of an upward departure, *see United States v. Booker,* 543 U.S. 220, 245, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) (stating that the Sentencing Reform Act of 1984 "makes the Guidelines effectively advisory. It requires a sentencing court to consider Guidelines ranges, but it permits the court to tailor the sentence in light of other statutory concerns as well.") (internal citation omitted), or in deciding to impose an upward variant sentence. Additionally, we conclude that the sentence imposed was both procedurally and substantively reasonable.

Accordingly, we affirm the district court's judgment. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

*AFFIRMED.*

## Parallel Citations

2011 WL 462748 (C.A.4 (N.C.))

---

**End of Document**    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

301 Fed.Appx. 256
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also Fourth
Circuit Rule 32.1 (Find CTA4 Rule 32.1)
United States Court of Appeals,
Fourth Circuit.

UNITED STATES of America, Plaintiff—Appellee,

v.

Tammy HENDERSON, Defendant—Appellant.

No. 08–4380.    |    Submitted: Oct.
22, 2008.    |    Decided: Nov. 24, 2008.

**Synopsis**

**Background:** Defendant was convicted in the United States
District Court for the District of South Carolina, G. Ross
Anderson, Jr., J., of conspiracy to make and possess
counterfeit securities, and was sentenced to 30 months'
imprisonment, and she appealed.

**[Holding:]** The Court of Appeals held that the sentence was
reasonable.

Affirmed.

West Headnotes (2)

**[1]**    **Sentencing and Punishment**
    👉 Objections and Disposition Thereof

In sentencing defendant for conspiracy to make
and possess counterfeit securities, the district
court did not err in accepting portions of
the pre-sentence report (PSR) as findings of
fact in determining the intended loss amount
from the offense and imposing a sentencing
guidelines offense level enhancement for being
a leader, manager, or supervisor in the offense,
without requiring the government to prove
the underlying facts, since, although defendant

originally objected to the PSR's findings on
those two issues, she stated at sentencing that
those objections had been resolved with the
government. Fed.Rules Cr.Proc.Rule 32(i)(3)
(A), 18 U.S.C.A.; U.S.S.G. § 3B1.1(c), 18
U.S.C.A.

**[2]**    **Conspiracy**
    👉 Sentence and Punishment

The defendant's 30-month sentence for
conspiracy to make and possess counterfeit
securities was reasonable; the district court
appropriately treated the sentencing guidelines
as advisory, considered the relevant statutory
sentencing factors, and sentenced defendant
within the properly calculated guidelines range
of 24 to 30 months. 18 U.S.C.A. § 3553(a);
U.S.S.G. § 1B1.1 et seq., 18 U.S.C.A.

**\*256** Appeal from the United States District Court for the
District of South Carolina, at Spartanburg. G. Ross Anderson,
Jr., District Judge. (7:07–cr–01206–GRA–1).

**Attorneys and Law Firms**

David W. Plowden, Assistant Federal Public Defender,
Greenville, South Carolina, for Appellant. David Calhoun
Stephens, Assistant United States Attorney, Greenville, South
Carolina, for Appellee.

Before WILKINSON, MICHAEL, and SHEDD, Circuit
Judges.

**Opinion**

Affirmed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this
circuit.

PER CURIAM:

Tammy Henderson appeals the district court's judgment
entered pursuant to her guilty plea to conspiracy to make
and possess counterfeit securities, in violation of **\*257** 18
U.S.C. § 513 (2000). Counsel for Henderson filed a brief

pursuant to *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), in which he asserts there are no meritorious issues for appeal, but asks this court to review whether the district court committed plain error in determining Henderson's sentence. Henderson filed a pro se supplemental brief in which she asserts a number of errors in her presentence report ("PSR") and the resulting Sentencing Guidelines range. Finding no error, we affirm.

Following *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), a district court must engage in a multi-step process at sentencing. First, it must calculate the appropriate advisory Guidelines range. It must then consider the resulting range in conjunction with the factors set forth in 18 U.S.C.A. § 3553(a) (West 2000 & Supp.2008) and determine an appropriate sentence. *Gall v. United States,* ––– U.S. ––––, 128 S.Ct. 586, 596, 169 L.Ed.2d 445 (2007). We review the district court's sentence for abuse of discretion. *Id.* at 597; *see also United States v. Pauley,* 511 F.3d 468, 473 (4th Cir.2007). This court "must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Gall,* 128 S.Ct. at 597.

If there are no procedural errors, we then consider the substantive reasonableness of the sentence. *Id.* "Substantive reasonableness review entails taking into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Pauley,* 511 F.3d at 473 (internal quotation marks and citation omitted). Further, this court may presume a sentence within the Guidelines range to be reasonable. *Id.* Mere disagreement with the district court's exercise of sentencing discretion does not permit us to substitute our judgment for that of the lower court. *Id.* at 473–74. "Even if we would have reached a different sentencing result on our own, this fact alone is 'insufficient to justify reversal of the district court.' " *Id.* at 474 (quoting *Gall,* 128 S.Ct. at 597).

Following the probation officer's preparation of the PSR, Henderson objected to the calculation of the intended loss amount, as well as to the inclusion of a two-level offense level enhancement for possession or use of device-making equipment, pursuant to *U.S. Sentencing Guidelines Manual* ("USSG") § 2B1.1(10)(A)(i) (2007), and a two-level enhancement for Henderson's role as a leader, manager, or supervisor, pursuant to USSG § 3B1.1(c). At the sentencing hearing, Henderson indicated that all of the objections had been resolved with the Government, as the parties agreed that the two-level enhancement for possession or use of device-making equipment should be removed, resulting in a total offense level of ten and a Sentencing Guidelines range of 24 to 30 months. Henderson received a 30–month sentence.

In her pro se brief, Henderson asserts that the PSR used by the district court at sentencing did not reflect the removal of the enhancement for possession or use of device-making equipment and that, as a result, she received a harsher sentence based on this allegation of "white-collar thievery." However, there is no indication in the record that Henderson received a longer sentence due to an enhancement that was brought to the court's attention **\*258** and was withdrawn prior to sentencing. Pursuant to Fed.R.Crim.P. 32(i)(1)(C), the district court properly permitted the parties to comment on the findings in the PSR and to notify the court that the enhancement for device-making equipment was erroneously included in the Guidelines calculation and should be removed. Accordingly, Henderson's claim is without merit.

 [1]    Henderson also contends the district court improperly calculated the intended loss amount and erroneously included a two-level enhancement for her role as a leader, manager, or supervisor. While she originally objected to the PSR's findings in regards to these two issues, Henderson stated at sentencing that those objections had been resolved with the Government. Accordingly, with no disputed issues presented at the sentencing hearing, the district court properly accepted the undisputed portions of the PSR as findings of fact. *See* Fed.R.Crim.P. 32(i)(3)(A). Because Henderson failed to raise any objections to the PSR, the district court did not err in determining the intended loss amount or imposing the leadership enhancement without requiring the Government to prove the underlying facts.

 [2]    Finally, in her *Anders* brief, Henderson contends that she received an unreasonable sentence. At the sentencing hearing, the district court appropriately treated the Guidelines as advisory, considered the relevant factors under § 3553(a), and sentenced Henderson within the properly calculated Guidelines range. Because Henderson has failed to demonstrate her sentence is either procedurally or substantively unreasonable, we find that the sentence

imposed by the district court was reasonable and should be affirmed.

In accordance with *Anders,* we have reviewed the record in this case and have found no meritorious issues for appeal. We therefore affirm the district court's judgment. This court requires that counsel inform his client, in writing, of her right to petition the Supreme Court of the United States for further review. If the client requests that a petition be filed, but counsel believes such a petition would be frivolous, then counsel may move in this court for leave to withdraw

from representation. Counsel's motion must state that a copy thereof was served on the client. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

*AFFIRMED.*

**Parallel Citations**

2008 WL 4997588 (C.A.4 (S.C.))

---

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 5425775
Only the Westlaw citation is currently available.
United States District Court,
D. Nevada.

UNITED STATES of America, Plaintiff,
v.
Ryan MASTERS, Defendant.

No. 2:12–cr–00145–MMD–
GWF.   |   Nov. 6, 2012.

**Attorneys and Law Firms**

Michael Chu, U.S. Attorney's Office, Las Vegas, NV, for
Plaintiff.

Chris T. Rasmussen, Rasmussen & Kang LLC, Las Vegas,
NV, for Defendant.

**Opinion**

**ORDER**

MIRANDA M. DU, District Judge.

**(Defendant's Rule 29 Motion for Judgment of Acquittal)**

 **\*1** This Order addresses Defendant Ryan Masters' motion
for judgment of acquittal under Fed.R.Crim.P. 29. Masters
made the motion at the close of the government's case based
on two grounds: (1) the access devices were not usable under
United States v. Onyesoh, 674 F.3d 1157 (9th Cir.2012) and
(2) venue is not proper in the District of Nevada. For the
reasons discussed below, Masters' motion is denied.

**I. BACKGROUND**

The Superseding Indictment charges Masters with one
count of conspiracy to possess 15 or more access devices
or unauthorized access devices and effecting fraudulent
transactions with access devices that spans from May 2010
to April 2012. Masters is also indicted on four counts of
possession of 15 or more access devices or unauthorized
access devices on June 18, 2010 (count 2), June 27, 2010
(count 3), April 10, 2011 (count 4) and May 2, 2011. He is
also indicted on one count (count 5) of aggravated identity
theft.

**II. LEGAL STANDARD**

A criminal defendant's challenge to the constitutional
sufficiency of evidence to support a criminal conviction
is governed by Jackson v. Virginia, 443 U.S. 307, 319
(1979). Jackson requires a court, upon such a motion, to
construe the evidence "in the light most favorable to the
prosecution" to determine whether "*any* rational trier of fact
could have found the essential elements of the crime beyond a
reasonable doubt." (Emphasis in original). When considering
evidence in the light most favorable to the prosecution, "faced
with a record of historical facts that supports conflicting
inferences, a reviewing court must presume-even if it does
not affirmatively appear in the record-that the trier of fact
resolved any such conflicts in favor of the prosecution, and
must defer to that resolution." United States v. Nevils, 598
F .3d 1158, 1164 (9th Cir.2010) (en banc) (quoting Jackson,
443 U.S. at 326).

**II. DISCUSSION**

**A. Venue**

Masters argues that during most of the period of the alleged
conspiracy he lived in Florida and the evidence is not clear as
to where the alleged co-conspirator, Jack Newsome, resides.
Masters thus argues that the government fails to establish by
a preponderance of the evidence that any of the offenses was
committed in the District of Nevada.

"To decide whether venue is proper in a district, we 'must
initially identify the conduct constituting the offense (the
nature of the crime) and then discern the location of the
commission of the criminal acts.' " U.S. v. Lukashov, 694
F.3d 1107, 1120 (9th Cir.2012) (quoting U.S. v. Rodriguez–
Moreno, 526 U.S. 275, 279 (1999)). For continuing offenses,
venue is "proper if an 'essential conduct element' of the
offense begins in, continues into, or is completed in the
charging district." Id.; 18 U.S.C. § 3237(a).

**1. *Count 1***

Venue for the conspiracy count is appropriate in the
District of Nevada if any of the alleged conduct committed
in furtherance of the conspiracy begun, continued or
completed in Nevada. The government presented evidence to
demonstrate that Masters was in Las Vegas, Nevada, when he
communicated with the individual by the name of TuzzTuzz
in the chat log marked as the government's Ex. 19. Masters
explained to TuzzTuzz in the chat log on April 9, 2011,

that he was in the car across from the WU (Western Union) and provided the MTCN and his location (as the sender) as Las Vegas, Nevada. (Ex. 19 at 7 .) The government's Ex. 9 is a copy of the Western Union receipt with the same MTCN showing a Las Vegas, Nevada, address. In the chat log, Masters asked TuzzTuzz several times for "fulls" from the State of Nevada. (Ex. 19 at 8–9, 12,16, 24.) Masters went on to inform TuzzTuzz that "[w]e live in Las Vegas ... read about my city online, everything here is 24 hours ..." (*Id.* at 22.) In April 2011, Masters was arrested at a Best Buy in Las Vegas after he attempted to buy gift cards using e-gift cards. The government has established by a preponderance of the evidence that Masters either began, continued or completed the acts in furtherance of the conspiracy in Nevada.

## 2. Counts 2 and 3

**\*2** Counts 2 and 3 involve possession of 15 or more access devices on or about June 18, 2010 and June 27, 2010. The government seeks to establish that Masters is guilty of aiding and abetting others with the intent to defraud. The government has demonstrated by a preponderance of the evidence through a series of emails exchanged between Masters and Newsome (using different email addresses) that Newsome was in Las Vegas between May and July 2010. On May 31, 2010, Newsome wrote Masters that he "just got home, just no orders at md prky that's the devil clerk store." (Ex. 35.) The government offered evidence that this was in reference to the Best Buy store on Maryland Parkway in Las Vegas. On June 5, 2010, Masters emailed Newsome: "so you think it would be worth it for me to head back out there? Vegas changed a lot since when I was first there ... I just don't know when it's going to get better." (Ex. 41.) Newsome responded that "I think if you came back me and you can definitely make something happen for real." (*Id.*) On June 7, 2010, Newsome again asked "WHAT HAVE YOU DECIDED BOUT COMING BACK." (Ex. 43.) Masters responded that he was and "[g]oing to be changing my number to 702 soon." (*Id.*) In fact, Masters also wrote that he was "gonna hit bestbuys across the country as I came towards there." (*Id.*) On June 18, 2010, Newsome wrote that he had a flat tire and had to walk on South Las Vegas Boulevard. (Ex. 138.) On July 27, 2010, Newsome asked Masters to call him and provided a phone number with 702 area code (Ex. 63), which was registered to an individual in Las Vegas, Nevada (Ex. 131).

## 3. Count 4

Count 4 involves the same offense as counts 2 and 3, but occurred on April 10–12, 2011. The chat log showing Masters was in Las Vegas covers conversations between Masters and TuzzTuzz from April 6 to April 12, 2011. The Western Union receipts offered as Ex. 9 shows Masters sent money from several Western Union locations in Las Vegas and Henderson, Nevada, between April 16–25, 2011. This evidence shows Masters was in the District of Nevada on April 10–12, 2011.

## 4. Count 5

Count 5, aggravated identity theft, involves possession of the means of identification of John Ballis on April 10, 2011. Ex. 19 shows that TuzzTuzz gave Masters Mr. Ballis' personal information, including his credit card and social security number. (Ex. 9 at bates number 2123–2125.) On that same date, an order was placed with Best Buy for a laptop and billed to Mr. Ballis but designated for pick up in Las Vegas by Masters. (Ex. 77.) Again, such evidence demonstrates that the offense was committed in the District of Nevada.

## 5. Count 6

Count 6 involves possession of access devices belonging to customers of the Aruba Hotel and Spa on May 2, 2011. Masters was arrested in Las Vegas, Nevada, on that date. Masters' car had a Nevada license plate. (Ex. 2.) His offense occurred in the District of Nevada.

## B. Usable Access Devices

**\*3** Masters relies on *United States v. Onyesoh,* 674 F.3d 1157 to argue that the government must establish the access devices possessed by Masters were usable. *Onyesoh* involved the sentencing of a defendant convicted of possession of 15 or more unauthorized access devices. At sentencing, the government presented evidence that the defendant possessed 500 expired credit card numbers, and recommended a 12–level enhancement under the sentencing guidelines. *Id.* at 1158. The government arrived at this figure because a note to the sentencing guidelines assesses a minimum loss of $500 per device in the defendant's possession. *Id* . The district court agreed with the government's calculation, and applied the enhancement, determining that the expired credit card numbers constituted access devices without any further proof of their usability. *Id.* The Ninth Circuit reversed, holding that access devices must be usable and cannot be expired in order for the minimum loss to be factored into the sentencing calculus. *Id.* at 1159. Further, the court held that

the government carries the burden of demonstrating proof of usability. *Id.* at 1160. It may do this by, for example, offering expert testimony or offering evidence that the defendant was prepared to use the number in combination with another device. *Id.*

Assuming *Onyesoh* applies in non-sentencing contexts, and viewing the evidence in the light most favorable to the government, the Court holds that the government has established that the access devices pertinent to each count meet the usability criteria. In support of count 1, the government offers Exs. 11 and 127B to show Masters purchased merchandise from Buy Best on April 26–29, 2011, using unauthorized access devices and the information from Chase Bank showing fraudulent purchases of access devices identified in the chat log between Masters and TuzzTuzz (Ex. 19) issued by Chase Bank. Count 2 involves gift cards issued by Whittaker Bank whose representative testified that her bank received complaints of fraud by customers who purchased gift cards starting in June 2010 to December 2010 when they discontinued the gift card program. Her testimony

shows that gift cards were not only active and usable but were actually used. Exhibit 48 is an email from Masters to Newsome that contains a list of gift cards, some of which had balances. Count 3 involves gift cards issued by Account Now whose representative testified that these cards were issued to customers who had to apply to purchase them. Such evidence shows that these access devices were usable. Count 4 involves the access devices issued by Chase Bank. Again, the government has offered evidence to show these devices were usable. (Ex. 19 and 127B.) Count 5 involves John Ballis' credit card which was used to purchase a laptop from Best Buy. (Ex. 77.) As to Count 6, the Aruba Hotel and Spa records show that numerous credit card numbers in Masters' possession had not yet expired at the time of his arrest in May 2011. (*See, e.g.,* Ex. 11 at bates numbers 682, 725, 729, 753, 755 759–761, 769, 788, 811, 820, 873, 876, 956.)

## IV. CONCLUSION

**\*4** For the reasons discussed above, Masters' motion for judgment of acquittal is DENIED.

---

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

353 Fed.Appx. 875
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also Fourth
Circuit Rule 32.1 (Find CTA4 Rule 32.1)
United States Court of Appeals,
Fourth Circuit.

UNITED STATES of America, Plaintiff-Appellee,

v.

Letty MELLOR, Defendant-Appellant.

No. 08-4312.    |    Submitted: Oct.
29, 2009.    |    Decided: Nov. 25, 2009.

**Synopsis**

**Background:** Defendant was convicted by jury in the United
States District Court for the Western District of Virginia,
Glen E. Conrad, J., of seven counts pertaining to conspiracy
to traffic in, use, produce and possess unauthorized and
counterfeit access devices, and sentenced to total of 65
months in prison. Defendant appealed.

**Holding:** The Court of Appeals held that evidence was
sufficient to convict defendant of conspiracy to traffic in,
use, produce and possess unauthorized and counterfeit access
devices.

Affirmed.

West Headnotes (1)

**[1]**    **Conspiracy**
         👉 Fraud and false pretenses in general

Evidence was sufficient to convict defendant of
conspiracy to traffic in, use, produce and possess
unauthorized and counterfeit access devices;
while defendant worked as server at restaurant
46 of her customers had credit or debit card
numbers stolen, neither before defendant began
employment, nor after she left, did restaurant

experience similar problems with customers'
credit or debit card numbers being stolen,
when defendant left restaurant, she took job
at department store, and in few weeks that
she worked there, four instances where credit
card customer informed credit card company
that he did not make purchase charged to
his account, were completed under defendant's
associate number, defendant's husband and third
party arranged for waiter at another restaurant
to steal credit and debit card numbers from
customers using skimmer, and waiter ultimately
used device to obtain 50 to 60 credit or debit card
numbers from customers. 18 U.S.C.A. §§ 2, 371,
1028A(a)(1), 1029(a)(1, 3, 4).

**\*875**  Appeal from the United States District Court for the
Western District of Virginia, at Roanoke. Glen E. Conrad,
District Judge. (7:07-cr-00003-gec-2).

**Attorneys and Law Firms**

Thomas E. Wray, Roanoke, Virginia, for Appellant. Julia
C. Dudley, United States Attorney, Ashley B. Neese,
Assistant United **\*876** States Attorney, Roanoke, Virginia,
for Appellee.

Before GREGORY, DUNCAN, and AGEE, Circuit Judges.

**Opinion**

Affirmed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this
circuit.

PER CURIAM:

Following a jury trial, Letty Mellor was convicted on
seven counts pertaining to a conspiracy to traffic in, use,
produce and possess unauthorized and counterfeit access
devices. [*] The district court sentenced her to a total of
sixty-five months in prison. Mellor appeals, arguing that the
largely circumstantial evidence was insufficient to support
her convictions. Finding her claim to be without merit, we
affirm.

A jury's verdict must be upheld on appeal if there is substantial evidence in the record to support it. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Perry,* 560 F.3d 246, 254 (4th Cir.), *cert. denied,* --- U.S. ----, 130 S.Ct. 177, 175 L.Ed.2d 112 (2009). In determining whether the evidence in the record is substantial, we view the evidence in the light most favorable to the Government, and inquire whether there is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt. *United States v. Burgos,* 94 F.3d 849, 862 (4th Cir.1996) (en banc). In evaluating the sufficiency of the evidence, we do not review the credibility of the witnesses and assume that the jury resolved all contradictions in the testimony in favor of the Government. *United States v. Romer,* 148 F.3d 359, 364 (4th Cir.1998).

The evidence presented at trial showed that, while Mellor was working as a server at the Texas Steakhouse and Saloon, forty-six of her customers had their credit or debit card numbers stolen. Neither before Mellor began her employment in May 2006, nor after she left in August 2006, did the restaurant experience similar problems with customers' credit or debit card numbers being stolen. When Mellor left the Texas Steakhouse, she took a job at Sears in the jewelry department. In the few weeks that she worked there, four chargeback transactions, instances where a credit card customer informs the credit card company that he or she did not make a purchase charged to his or her account, were completed under Mellor's associate number.

Also in 2006, Mellor's husband, Landy Diaz, and Mario Rojas, the owner of a small jewelry store, arranged for Julio Mendez, a waiter at the Rancho Viejo restaurant, to steal credit and debit card **\*877** numbers from his customers using a skimmer, a device used to retrieve and store numbers from the magnetic strip on the back of a credit or debit card. Mendez ultimately used the device to obtain fifty to sixty credit or debit card numbers from his customers.

Although no one witnessed Mellor using or possessing a skimmer at the Texas Steakhouse, the pockets in the apron she wore as part of her uniform were large enough to conceal such a device. At least one account fraudulently used at Sears during transactions for which Mellor was the cashier belonged to a victim who previously used her card at the Rancho Viejo where Julio Mendez had been her server. Two other fraudulent transactions at Sears for which Mellor was the cashier bore the signature "Mario Rojas."

Mellor also used a counterfeit card embossed with her father-in-law's name, but encoded with a number belonging to a customer at the Rancho Viejo who had been served by Mendez. Moreover, a laptop found in the Mellor-Diaz home contained numerous articles pertaining to the use of credit card information. The only username in the computer was "Letty Mellor." Finally, Mellor and Diaz moved from Virginia to Florida the same day a press release announced that they were suspects.

Viewed in the light most favorable to the Government, we find that the evidence was sufficient to support the jury's verdict on all counts. Accordingly, we affirm. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

*AFFIRMED.*

### Parallel Citations

2009 WL 4071825 (C.A.4 (Va.))

Footnotes

* Specifically, the jury convicted Mellor of conspiracy to use, produce, and possess and traffic in unauthorized and counterfeit access devices, in violation of 18 U.S.C. § 371 (2006); trafficking in, producing, and using counterfeit access devices, in violation of 18 U.S.C. §§ 1029(a)(1) & 2 (2006); possessing fifteen or more counterfeit or unauthorized access devices, in violation of 18 U.S.C. §§ 1029(a)(3) & 2 (2006); trafficking in, having control or custody of, and possessing "a skimming device designed to capture credit card numbers and related data as a credit card is swiped through the device," in violation of 18 U.S.C. §§ 1029(a)(4) & 2 (2006); unlawful possession of one or more credit card numbers during and in relation to the trafficking in, producing, and using counterfeit access devices, in violation of 18 U.S.C. §§ 1028A(a)(1) & 2 (2006); unlawful transfer and use of one or more credit card numbers during and in relation to the possession of fifteen or more counterfeit or unauthorized access devices, in violation of 18 U.S.C. §§ 1028A(a)(1) & 2; and unlawful use of one or more credit card numbers during and in relation to the possession of access device-making equipment, in violation of 18 U.S.C. §§ 1028A(a)(1) & 2.

**U.S. v. Mellor, 353 Fed.Appx. 875 (2009)**

---

**End of Document** © 2014 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 199730
Only the Westlaw citation is currently available.
United States District Court, E.D. North Carolina,
Western Division.

UNITED STATES of America,
v.
Tonia Best MILNER, and Keisha
Ann Thompson, Defendants.

No. 5:07–CR–158.    |    Jan. 23, 2008.

**Attorneys and Law Firms**

Clay Wheeler, U.S. Attorney's Office, Raleigh, NC, for
United States of America.

**Opinion**

### ORDER

JAMES C. DEVER III, District Judge.

**\*1**  On September 10, 2007, pursuant to a plea agreement,
Tonia Best Milner ("Milner") pleaded guilty to two counts
of bank fraud and aiding and abetting, in violation of 18
U.S.C. §§ 1344 and 2, respectively. On that same date, Keisha
Ann Thompson ("Thompson") also pleaded guilty, pursuant
to a plea agreement, to the same two charges. On January
11, 2008, the court gave notice pursuant to Federal Rule
of Criminal Procedure 32(h) that it was contemplating an
upward variance sentence with respect to each defendant. *See
United States v. Milner,* No. 5:07–CR–158–D (E.D.N.C. Jan.
11, 2008). On January 15, 2008, Thompson filed a sentencing
memorandum opposing an upward variance. On January 16,
2008, Milner filed a sentencing memorandum opposing an
upward variance. Also, on January 16, 2008, the United States
("government") filed a motion for downward departure for
substantial assistance on Thompson's behalf.

On January 16, 2008, the court held sentencing hearings
for each defendant. The court considered each defendant's
Presentence Investigation Report ("PSR"), all evidence
presented at the hearings, and all arguments and submissions
of counsel. As discussed in each defendant's respective
PSR and at the sentencing hearings, Milner and Thompson
participated in a scheme to defraud that lasted more than
eight years. During the scheme, Milner and Thompson stole
more than $600,000 from the bank where Milner worked.

The statutory maximum sentence for each count of conviction
is 360 months. The court enters this order to explain
Milner's 72–month sentence (including a nine-month upward
variance) and Thompson's 48–month sentence (including a
seven-month upward variance).

### I.

After reviewing each defendant's PSR, the evidence
presented at the sentencing hearings, and the arguments and
submissions of counsel, the court adopted the undisputed
portions of each defendant's PSR. *See* Fed.R.Crim.P. 32(i)(3).
The court made additional findings of fact at the defendants'
sentencing hearings, which are hereby incorporated by
reference. The court recounts some of its findings in this
order.

Milner and Thompson grew up in Wilson, North Carolina and
had known each other for many years. In 1998, they shared
an apartment together in Wilson. At that time, Thompson
(then age 21) was a former employee of the Branch Banking
& Trust Corporation (BB & T) in Wilson, and complained
to Milner about her financial difficulties. Milner, then age
25 and a current BB & T employee at the Wilson branch,
suggested a way that the two women could steal unclaimed
funds from BB & T using Milner's position in the claims
adjustment department.

BB & T's adjustment department handled unclaimed funds
belonging to other banks. As a part of the innumerable daily
transactions between banks, small "bundles" of checks were
sometimes left unclaimed. *See* Milner PSR ¶ 7. BB & T placed
the funds represented by these "bundles" of checks into a
holding account, where they stayed until a claimant came
forward. At times, these bundles would sit for months without
a claimant coming forward. Milner's job included keeping the
general ledger with respect to these unclaimed bundles. *See
id.*

**\*2**  Under BB & T's procedures, the claimant bank would
claim the funds by sending a cash letter to BB & T's claims
adjustment department requesting that BB & T transfer the
unclaimed funds to the claimant bank. The letter could be
written on bank letterhead, but also could be written on
plain paper without any indicia of authenticity. Milner and
Thompson took advantage of BB & T's (misplaced) reliance
on Milner's honesty to steal unclaimed funds from BB & T.
*See id.*

In early 1998, Milner told Thompson to fax to Milner's attention a letter from a fictitious person named "Patricia Long," requesting that Milner release $500 in unclaimed funds to an account which purportedly belonged to a claimant bank, but which in fact belonged to Thompson. Thompson did so, and on April 1, 1998, Milner scanned BB & T's accounting books to piece together a set of unclaimed fund bundles that added up to $500. *See id.* ¶ 8. Once Milner identified unclaimed bundles equaling the $500 amount, she transferred the funds to Thompson's personal bank account. Thompson then withdrew Milner's share of the stolen money and gave it to Milner. This $500 theft was the inception of a scheme that would ultimately span approximately 8½ years, involve nearly 140 separate transactions, and result in the theft of nearly $625,000.

After this first transaction, Milner and Thompson altered the scheme to make it harder to detect. Rather than having Thompson send a demand for an arbitrary amount of funds, Milner would scan the BB & T books in advance for an appropriate target bundle of funds—one which was neither so large nor so stale as to attract attention when claimed. Having identified the target bundle, Milner would inform Thompson of the amount that the fictitious claimant was to request. Thompson would then fax the letter to Milner's attention. Usually the letter was from "Patricia Long," which the women recognized as a code to indicate their fraud. After illegally transferring the funds to Thompson's account, Milner would conceal the fraud under multiple layers of internal transactions. Thompson would then withdraw Milner's share of the ill-gotten gains from her account and provide it to Milner. Thompson also would sometimes cover up the scheme by further transferring the funds into multiple bank accounts, including those of Thompson's minor daughter and Milner's husband. Between April 1, 1998, and January 14, 1999, the women stole $68,087.58 from BB & T. *See id.* ¶¶ 8–9.

By February 1999, Milner had decided to leave her job at BB & T to move to Chicago. Milner and Thompson agreed to make their final theft their largest to date. Accordingly, on February 18, 1999, Milner and Thompson stole $15,000 from BB & T. *See id.* ¶ 8. This was the largest single amount stolen in one transaction during the scheme. *See id.* After stealing the $15,000, Milner quit her job at the bank and moved to Chicago. The fraud scheme thus temporarily stopped, with a total loss to BB & T of $83,087.58. *See id.*

**\*3** In early 2000, Milner left Chicago, moved back to Wilson, and obtained her former job at BB & T. After eleven months to consider their crimes, Milner and Thompson were undeterred and unrepentant, and promptly renewed the scheme. Between January 21, 2000, and October 4, 2006, through 107 separate fraudulent transactions, the two women stole an additional $539,960.11 from BB & T. *See id.* By March 2002, Thompson had moved to Virginia Beach, Virginia and had begun working at a branch of HSBC Bank USA, N.A. ("HSBC"). Nonetheless, Thompson continued in the scheme. *See* Thompson PSR ¶ 26.

BB & T finally detected the scheme in August 2006 when BB & T officials became suspicious that bundles of funds which had been sitting in the holding account for very long periods of time began to be claimed. When BB & T officials finally discovered the fraud, they confronted Milner. Milner confessed to taking money from BB & T, but did not disclose the amount stolen or the full extent of the fraud. *See* Milner PSR ¶ 10. BB & T reported the fraud to the FBI. The FBI began an investigation, as did BB & T. The FBI and BB & T quickly determined the scope of the fraudulent scheme and the loss to BB & T.

Throughout the scheme, Milner kept approximately two-thirds of the stolen funds, and Thompson received one-third. Milner claimed the larger share because she told Thompson that she was "taking a bigger risk" than Thompson, and that there was a third person involved in the scheme. Milner described this third person to Thompson as a Caucasian woman who worked in Milner's office, but Milner would not reveal this person's name to Thompson. Proving the adage that there is no honor among thieves, there was no such third person. As a result of Milner's lie to Thompson, Milner ultimately received approximately 66% of the $623,047.69 in stolen funds, while Thompson received approximately 34%.

Government investigators interviewed Thompson in April 2007. Thompson initially stated that the scheme had operated for approximately "a couple years." However, Thompson confessed to the full breadth of the fraud after the FBI confronted her with the full extent of the evidence. Although in April 2007 the government already knew to a reasonable certainty that only Milner and Thompson were involved, it requested that Thompson place a monitored phone call to Milner regarding the identity of the alleged third person. Thompson made the call, and Milner reported that the third person no longer worked at BB & T and could not be contacted. *See* Thompson PSR ¶ 12.

## II.

The Supreme Court has described the process for imposing a sentence under the now-advisory sentencing guidelines as follows:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable [United States Sentencing] Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the [18 U.S.C.] § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented. If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.... [A] major departure should be supported by a more significant justification than a minor one. After settling on the appropriate sentence, he must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing.

**\*4**   *Gall v. United States,* 128 S.Ct. 586, 596–97 (2007) (citations and footnote omitted); *see also Kimbrough v. United States,* 128 S.Ct. 558, 569–70 (2007) ("[W]hile the statute still requires a court to give respectful consideration to the Guidelines, *[United States v.] Booker* permits the court to tailor the sentence in light of other statutory concerns as well." (citations and quotation omitted)); *Rita v. United States,* 127 S.Ct. 2456, 2469 (2007) ("The sentencing judge has access to, and greater familiarity with, the individual case and the individual defendant before him than the [United States Sentencing] Commission or the appeals court."); *Cunningham v. California,* 127 S.Ct. 856, 867 (2007); *United States v. Pauley,* No. 07–4270, 2007 WL 4555520, at *4 (4th Cir. Dec. 28, 2007). The court recognizes its duty within this framework to "make an individualized assessment based on the facts presented," *Gall,* 128 S.Ct. at 597, and to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [the sentencing statute]." 18 U.S.C. § 3553(a); *see Kimbrough,* 128 S.Ct. at 570; *accord United States v. Tucker,* 473 F.3d 556, 560–61 (4th Cir.2007); *United States v. Davenport,* 445 F.3d 366, 370 (4th Cir.2006).

## III.

Under the procedure described in *Gall,* the court must first calculate the advisory guideline range with respect to each defendant. *See Gall,* 128 S.Ct. at 596–97.

## A.

The court turns first to the advisory guideline range for defendant Milner, as discussed in her PSR. The bank fraud count and the aiding and abetting count are grouped. *See* U.S. Sentencing Guidelines Manual § 3D1.2(d) (2007) [hereinafter "U.S.S.G."]; Milner PSR, Part D. The base offense level for violating 18 U.S.C. § 1344 is 7. *See* U.S.S.G. § 2B1.1; Milner PSR ¶ 32. Because the loss exceeded $400,000 but was less than $1,000,000, the court adds 14 levels. *See* U.S.S.G. § 2B1.1(b)(1)(H); Milner PSR ¶ 33. The court adds two more levels because the offense involved "sophisticated means." *See* U.S.S.G. § 2B1.1(b)(9)(C); Milner PSR ¶ 34. The court also increases the offense level by two because Milner was a leader or organizer of the criminal activity. *See* U.S.S.G. § 3B1.1(c); Milner PSR ¶ 36. The court also increases the offense level by two because Milner abused a position of trust in a manner that significantly facilitated the commission or concealment of the fraud. *See* U.S.S.G. § 3B1.3; Milner PSR ¶ 37. Milner receives a three-level reduction for acceptance of responsibility. *See* U.S.S.G. § 3E1.1(b); Milner PSR ¶ 41. Milner's total adjusted offense level is therefore 24. Because Milner has no criminal history points, her criminal history category is I. The advisory guideline range for criminal history category I and offense

level 24 is 51 to 63 months. *See* U.S.S.G. § 5A (sentencing table); Milner PSR ¶ 45.

**\*5** Milner objects to the two-level enhancement under U.S.S.G. § 3B1.1(c) for her role in the offense. [1] Milner contends that she was not an organizer or leader. Rather, she argues that she and Thompson were equal partners in the fraud.

A defendant's role in the offense is a factual question for the district court. *See, e.g., United States v. Sayles,* 296 F.3d 219, 224 (4th Cir.2002). The government bears the burden of proving Milner's leadership role in the offense by a preponderance of the evidence. *See, e.g., United States v. Melton,* 970 F.2d 1328, 1334 (4th Cir.1992). In determining a defendant's role in the offense, the Guidelines Manual lists seven nonexclusive factors that a court may consider: (1) whether the defendant exercised decisionmaking authority; (2) the nature of the defendant's participation; (3) whether the defendant recruited others; (4) whether the defendant claimed a larger share of the proceeds; (5) the defendant's degree of participation in planning or organizing the offense; (6) the nature and scope of the crime; and (7) the defendant's degree of control over others. *See* U.S.S.G. § 3B1.1 cmt. n. 4. [2]

Here, Milner exercised decisionmaking authority by determining which bundles of funds the women would steal. She planned each transaction, scanning BB & T's accounts to determine the target bundle, and directed Thompson how much to request in each false cash letter. Milner's participation was extensive and essential to executing the scheme to defraud. Moreover, she claimed 66% of the purloined funds. For these reasons and the reasons stated in open court, Milner was an organizer or leader, and her objection is overruled. Her advisory guideline range remains 51 to 63 months.

### B.

The court turns next to Thompson's advisory guideline range, as discussed in her PSR. As with defendant Milner, the bank fraud and aiding and abetting counts are grouped. *See* U.S.S.G. § 3D1.2(d); Thompson PSR, Part D. The base offense level for violating 18 U.S.C. § 1344 is 7. *See* U.S.S.G. § 2B1.1; Thompson PSR ¶ 36. Because the loss exceeded $400,000 but was less than $1,000,000, the court adds 14 levels. *See* U.S.S.G. § 2B1.1(b)(1)(H); Thompson PSR ¶ 37. The court adds two levels because the offense

involved "sophisticated means." *See* U.S.S.G. § 2B1.1 (b)(9)(C); Thompson PSR ¶ 38. Thompson receives a three-level reduction for acceptance of responsibility. *See* U.S.S.G. § 3E1.1(b); Thompson PSR ¶ 44. Thompson's total adjusted offense level is 20. Thompson has no criminal history points, and her criminal history category is therefore I. The advisory guideline range for criminal history category I and offense level 20 is 33 to 41 months. *See* U.S.S.G. § 5A (sentencing table); Thompson PSR ¶ 48.

Thompson objects to the two-level increase under U.S.S.G. § 2B1.1(b)(9)(C) for "sophisticated means." Alternatively, Thompson objects to not receiving a two-level reduction under U.S.S.G. § 3B1.2(b) for being a "minor participant" in the criminal activity. [3] The court turns first to Thompson's sophisticated means objection.

**\*6** Thompson contends that she did not use sophisticated means because her role was akin to that of a bank teller embezzling funds. Whether an offense involved "sophisticated means" is a factual question which the district court resolves by a preponderance of the evidence. *See, e.g., United States v. Noe,* 191 F. App'x 216, 218 (4th Cir.2006) (per curiam) (unpublished). "Sophisticated means" are those which are "especially complex or intricate" as regards "the execution or concealment of the offense." U.S.S.G. § 2B1.1 cmt. n. 8(B). "Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts ... ordinarily indicates sophisticated means." *Id.* Courts have held that the sophisticated means enhancement applies when the offense conduct is more complex than the average case. *See, e.g., United States v. Finck,* 407 F.3d 908, 911, 915 (8th Cir.2005) (concluding that sophisticated means enhancement properly applied where defendant engaged in fraudulent scheme to acquire motor vehicles and ultimately pleaded guilty to "transportation of a stolen vehicle in interstate commerce —an offense that can be as simple as stealing a car and driving it across state lines"); *United States v. Humber,* 255 F.3d 1308, 1313–14 (11th Cir.2001) (illustrating application of sophisticated means enhancement where "[defendant's] crime against the Bank involved continuous acts of fraud over a seven year" period); *accord United States v. McCormick,* 208 F. App'x 246, 247–48 (4th Cir.2006) (per curiam) (unpublished) (concluding that sophisticated means enhancement properly applied in uttering case where "[t]here was far more to the offense than forging a signature, as McCormick suggests"); *United States v. Stone,* 85 F. App'x 925, 938 (4th Cir.2004) (per curiam) (unpublished)

("Sophisticated means includes conduct that is more complex or demonstrates greater intricacy or planning than a routine tax-evasion case." (quotation omitted)). A simple check-kiting scheme can constitute bank fraud, *see, e.g., United States v. Pardo,* 25 F.3d 1187, 1189 (3d Cir.1994), and the defendants' offense conduct went far beyond that. Milner hid the fraud under multiple layers of internal transactions. Thompson helped to execute the fraud by repeatedly sending fraudulent cash letters containing fictitious names. Thompson also helped to hide some of the stolen funds in multiple bank accounts. *See* Thompson PSR ¶¶ 9, 13. For these reasons and the reasons stated in open court, Thompson's sophisticated means objection is overruled.

Alternatively, Thompson objects to not receiving a two-level reduction under U.S.S.G. § 3B1.2(b) for being a "minor participant" in the criminal activity. Thompson bears the burden of proving her "minor role" by a preponderance of the evidence. *See, e.g., United States v. Akinkoye,* 185 F.3d 192, 202 (4th Cir.1999). A "minor participant" is one "who is less culpable than most other participants...." U.S.S.G. § 3B1.2 cmt. n. 5. With respect to the "minor participant" adjustment, "[t]he critical inquiry is ... not just whether the defendant has done fewer 'bad acts' than [her] co-defendant[ ], but whether the defendant's conduct is material or essential to committing the offense." *United States v. Pratt,* 239 F.3d 640, 646 (4th Cir.2001) (quotation omitted).

**\*7** Here, Thompson's conduct was material and essential to committing the fraud. She drafted the fictitious claim letters requesting the sums that Milner targeted, and faxed the fraudulent letters to Milner. Thompson also helped mask the fraud by transferring stolen funds from her own account to other accounts. *See* Thompson PSR ¶¶ 9, 13. For these reasons and the reasons stated in open court, Thompson was not a minor participant, and her objection is overruled. Accordingly, Thompson's advisory guideline range remains 33 to 41 months.

The government filed a motion for downward departure under U.S.S.G. § 5K1.1 on Thompson's behalf for providing substantial assistance to the government. The government recommended a 25% reduction from the low end of the advisory guideline range. Upon motion by the government, a court may depart below the advisory guideline range where "the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense." U.S.S.G. § 5K1.1. The court has discretion to determine whether to grant the motion and (if

granted) the amount of any reduction. *Id.* § 5K1.1 (a). In exercising its discretion, the court may consider, inter alia, the significance and usefulness of the defendant's assistance, the veracity and reliability of information provided by the defendant, the nature and extent of the assistance, whether the defendant risked peril to provide the assistance, and the timeliness of the assistance. *Id.*

As stated in open court, the court has considered the totality of Thompson's cooperation and finds the government's motion extremely weak. The key substantial assistance allegedly provided by Thompson consisted of making a monitored phone call to Milner regarding the purported third person involved in the scheme. By the time Thompson placed the phone call, however, the government already knew to a reasonable certainty that there was no third person involved in the scheme. Any information or statements the government gained through the phone call were not useful in its case against Milner. Nonetheless, because the information may have been useful to the investigation in a marginal sense, the court will grant the government's motion under U.S.S.G. § 5K1.1. However, as stated in open court, the court in its discretion rejects the government's recommended sentence for defendant Thompson.

## IV.

Under the procedure described in *Gall,* the court next must undertake an individualized assessment of the facts of each case in light of the factors listed in 18 U.S.C. § 3553(a). *See Gall,* 128 S.Ct. at 596–97. These factors include, inter alia, the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and protect the public from further crimes of the defendant, the need to avoid unwarranted sentencing disparities among similar defendants who committed similar crimes, and the need to provide restitution to victims of the offense. *See* 18 U.S.C. § 3553(a). The court must select a sentence in light of these factors and all other factors under section 3553(a), and must adequately explain the rationale for its sentence. *Gall,* 128 S.Ct. at 597. A variance sentence outside the advisory guideline range must be supported by a rationale sufficiently compelling to support the extent of the deviation. *Id* .

**\*8** As stated in open court, the nature and circumstances of this offense are unique, and particularly disturbing. The

length, scope, and sheer number of transactions involved in this offense are extraordinary, and reveal the defendants' relentless dedication to defrauding BB & T. Milner and Thompson spent over eight years stealing from BB & T. They stole over $600,000 from an institution where Milner held a position of trust. Milner concealed the evidence of her crimes using inside knowledge of the banking system gained through opportunities that BB & T provided to her. Moreover, Thompson helped execute the scheme with over 100 false cash letters and further concealed evidence of the scheme by hiding stolen funds in the bank accounts of others, including her minor daughter. Additionally, the sheer number of transactions involved is astonishing. Milner and Thompson had the opportunity to ponder what they had done after each of their 137 separate fraudulent transactions. Yet transaction after transaction, month after month, year after year, they continued to steal from BB & T. Moreover, the two had approximately eleven months to reflect on their crimes during the time when Milner quit her job and moved to Chicago. Notwithstanding this lengthy period of time in which to reflect, each elected to continue the fraud upon Milner's return to BB & T. As mentioned, after Milner's return to BB & T, the pair stole $539,960.11, and the scheme had no planned ending point. In this court's view, the women intended to continue stealing from BB & T indefinitely, and believed that they had devised the perfect crime.

The court considers this a very unique and very serious offense in light of the length, scope, and breadth of the offense, the elaborate nature of the scheme, and the near eleven-month break in the offense conduct. The court must impose a sentence that reflects this seriousness, will promote respect for the law, and will deter others. Deterring conduct of this unique nature is particularly important, because fraud of this length, scope, and breadth undermines the trust that is essential in the banking industry. Accordingly, having considered all of the relevant factors listed in 18 U.S.C. § 3553(a), the advisory guideline range, all evidence presented at the hearings, and all arguments and submissions of counsel, the court does not believe that a sentence within the advisory guideline range would be sufficient with respect to either defendant. See 18 U.S.C. § 3553(a). For these reasons and the reasons stated in open court, the court will vary upwardly with respect to each defendant.

**A.**

As for Milner, the court concludes for the reasons discussed above that a sentence of 72 months is sufficient, but not greater than necessary, to fulfill the purposes listed in the sentencing statute. This sentence represents a nine-month upward variance from the top of Milner's advisory guideline range. This sentence is well below the 360–month statutory maximum authorized as to each count of conviction. *See* 18 U.S.C. § 1344. Milner is hereby committed to the custody of the Bureau of Prisons to serve a term of imprisonment of 72 months on each count, such terms to be served concurrently. Upon release from the custody of the Bureau of Prisons, Milner shall be placed on a term of five years supervised release with respect to each count, such terms to be served concurrently.

**\*9** Restitution is mandatory in this case pursuant to 18 U.S.C. § 3663A. After deducting the sums recovered and the sums that were stolen outside of the dates listed in the indictment, the total amount of restitution owed is $605,843.45. Milner and Thompson shall be jointly and severally liable for this amount. The court will not impose a fine in light of the restitution due. Milner shall pay a special assessment of $100 on each count of conviction, for a total of $200, which shall be due immediately. If Milner is unable to pay the restitution and the special assessments in full immediately, she may make payments through the Inmate Financial Responsibility Program. Any balance owed at the time of release shall be paid in monthly installments of $ 150, which shall begin 60 days after Milner's release from prison. The Probation Office shall evaluate Milner's ability to pay at the time she is released from prison, and shall notify the court if changes to the payment schedule are needed. Restitution payments shall be submitted to BB & T at the address listed in Milner's PSR.

Within 72 hours of release from the custody of the Bureau of Prisons, Milner shall report in person to the Probation Office in the district into which she is released. While on supervised release, Milner shall not commit another federal, state, or local crime and shall not illegally possess a controlled substance. Milner shall not possess a firearm or destructive device, including ammunition. Milner shall comply with the standard conditions adopted by this court and shall comply with the following additional conditions.

Milner shall consent to a warrantless search by the Probation Office or, at the request of the Probation Office, by any other law enforcement officer of defendant's person or premises, including any vehicle, to determine compliance with the

conditions of this judgment. Milner shall submit to financial or consumer credit counseling as directed by the Probation Office. Milner shall cooperate in the collection of DNA as directed by the Probation Office. The court suspends the drug testing conditions of 18 U.S.C. § 3608. Milner was advised of her appeal rights in open court.

## B.

As for Thompson, the court rejects the government's recommended sentence. For the reasons discussed above, the government's recommendation fails to sufficiently account for the uniquely troubling nature, circumstances, and seriousness of the offense, as well as the need to deter the conduct at issue in this case. However, the court will credit Thompson's assistance under U.S.S.G. § 5K1.1 in fashioning "just punishment" under 18 U.S.C. § 3553(a)(2)(A). Accordingly, the court concludes that a sentence of 48 months is sufficient, but not greater than necessary, to fulfill the purposes listed in the sentencing statute. This sentence represents a seven-month upward variance from the top of Thompson's advisory guideline range. This sentence (like Milner's sentence) is well below the 360–month statutory maximum authorized as to each count of conviction. *See* 18 U.S.C. § 1344. Thompson is hereby committed to the custody of the Bureau of Prisons to serve a term of imprisonment of 48 months on each count, such terms to be served concurrently. Upon release from the custody of the Bureau of Prisons, Thompson shall be placed on a term of five years supervised release with respect to each count, such terms to be served concurrently.

**\*10** Restitution is mandatory in this case pursuant to 18 U.S.C. § 3663 A. After deducting the sums recovered and the sums that were stolen outside of the dates listed in the indictment, the total amount of restitution owed is $605,843.45. Milner and Thompson shall be jointly and severally liable for this amount. The court will not impose a fine in light of the restitution due. Thompson shall pay a special assessment of $100 on each count of conviction, for a total of $200, which shall be due immediately. If Thompson is unable to pay the restitution and the special assessments in full immediately, she may make payments through the Inmate Financial Responsibility Program. Any balance owed at the time of release shall be paid in monthly installments of $100, which shall begin 60 days after Thompson's release from prison. The Probation Office shall evaluate Thompson's ability to pay at the time she is released from prison, and

shall notify the court if changes to the payment schedule are needed. Restitution payments shall be submitted to BB & T at the address listed in Thompson's PSR.

Within 72 hours of release from the custody of the Bureau of Prisons, Thompson shall report in person to the Probation Office in the district into which she is released. While on supervised release, Thompson shall not commit another federal, state, or local crime and shall not illegally possess a controlled substance. Thompson shall not possess a firearm or destructive device, including ammunition. Thompson shall comply with the standard conditions adopted by this court and shall comply with the following additional conditions.

Thompson shall participate in a program of mental health counseling, as directed by the Probation Office. Thompson shall consent to a warrantless search by the Probation Office or, at the request of the Probation Office, by any other law enforcement officer of defendant's person or premises, including any vehicle, to determine compliance with the conditions of this judgment. Thompson shall submit to financial or consumer credit counseling as directed by the Probation Office. Thompson shall cooperate in the collection of DNA as directed by the Probation Office. The court suspends the drug testing conditions of 18 U.S.C. § 3608. Thompson was advised of her appeal rights in open court.

## C.

The court notes that it has imposed the sentences discussed above after considering all the facts and circumstances of the case, and would still impose the same sentence even if it has incorrectly calculated the advisory guideline range. *Cf., e.g., United States v. Keene,* 470 F.3d 1347, 1348–50 (11 th Cir.2006). The court believes that the variance sentences it has imposed in this case are the sentences that are "sufficient, but not greater than necessary, to comply with the purposes set forth in [the sentencing statute]." 18 U.S.C. § 3553(a); *cf., e.g., United States v. Shortt,* 485 F.3d 243, 246, 253 (4th Cir.2007) (holding that upward variance from zero- to six-month advisory guideline range to year-and-a-day sentence was reasonable); *United States v. McClung,* 483 F.3d 273, 275, 277 (4th Cir.2007) (holding that upward variance from 51– to 63–month advisory guideline range to 84–month sentence was reasonable); *accord United States v. Gordon,* No. 07–1714, 2008 WL 141796, at \*2–\*3, \*8 (7th Cir. Jan. 16, 2008) (holding that upward variance from 57– to 71–month advisory guideline range to 96–month sentence

was reasonable); *United States v. Klups,* No. 06–1931, 2008 WL 89949, at *1–*2 (6th Cir. Jan. 10, 2008) (holding that upward variance from 24– to 30–month advisory guideline range to 60–month sentence was reasonable); *United States v. Braggs,* No. 07–1148, 2008 WL 60180, at *1, *4 (8th Cir. Jan. 7, 2008) (holding that upward variance from 15– to 21–month advisory guideline range to 48–month sentence was reasonable).

**\*11** The court has imposed these sentences for the reasons discussed herein and the reasons discussed in open court, which are hereby incorporated by reference. This order memorializes the court's judgment as announced at each defendant's sentencing hearing on January 16, 2008, and is not intended to alter or amend any part of the court's judgment with respect to either defendant as announced in open court.

SO ORDERED.

## V.

Footnotes

1    Milner initially made two other objections to the PSR's advisory guideline calculations, which she withdrew at her sentencing hearing.

2    Although the Guidelines Manual suggests that these factors be used to distinguish a leadership role from a mere managerial role, *see* U.S.S.G. § 3B1.1 cmt. n. 4, courts have used these same factors to distinguish a managerial role from a non-managerial role. *See, e.g., United States v. Wall,* 214 F. App'x 318, 319 (4th Cir.2007) (per curiam) (unpublished).

3    Thompson initially made two factual objections to her PSR, which she withdrew at her sentencing hearing. Those factual objections did not impact her advisory guideline range.

---

**End of Document**                          © 2014 Thomson Reuters. No claim to original U.S. Government Works.

442 Fed.Appx. 763
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also Fourth
Circuit Rule 32.1 (Find CTA4 Rule 32.1)
United States Court of Appeals,
Fourth Circuit.

UNITED STATES of America, Plaintiff—Appellee,
v.
Sinclair Archibald MYERS, a/k/a Lyndon
Francis Lyndon, a/k/a Elijah Josiah Middleton,
a/k/a Frances Lyndon, a/k/a Stephen
Calvin Joseph, Defendant—Appellant.

No. 10–4819.    |    Submitted: April
20, 2011.    |    Decided: Aug. 9, 2011.

**Synopsis**
**Background:** Defendant was convicted, upon a guilty plea, in the United States District Court for the Eastern District of Virginia, James R. Spencer, Chief Judge, of illegal reentry after deportation for aggravated felony, and was sentenced to 84 months in prison. Defendant appealed.

**Holding:** The Court of Appeals held that sentence imposed was procedurally unreasonable.

Vacated and remanded for resentencing.

West Headnotes (1)

**[1]**    **Sentencing and Punishment**
            👉 Operation and effect of guidelines in
            general

        **Sentencing and Punishment**
            👉 Mandatory or advisory

        **Sentencing and Punishment**
            👉 Offense or adjudication in other jurisdiction

Imposition of 84-month prison term was procedurally unreasonable for defendant convicted of illegal reentry after deportation for aggravated felony; although the District Court correctly calculated the advisory Sentencing Guidelines range, which included a 16-level increase due to prior drug trafficking felony, the Court incorrectly indicated that it had no authority to not apply the 16-level enhancement. 18 U.S.C.A. § 3553(a); U.S.S.G. § 2L1.2(b)(1) (A), 18 U.S.C.A.

**\*763** Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. James R. Spencer, Chief District Judge. (3:10–cr–00028–JRS–1).

**Attorneys and Law Firms**

Michael S. Nachmanoff, Federal Public Defender, Frances H. Pratt, Valencia D. Roberts, Assistant Federal Public Defenders, Richmond, Virginia, for Appellant. Neil H. MacBride, United States Attorney, S. David Schiller, Assistant United States Attorney, Richmond, Virginia, for Appellee.

Before MOTZ, KING, and DUNCAN, Circuit Judges.

**Opinion**

Vacated and remanded by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Sinclair Archibald Myers pled guilty without a plea agreement to one count of illegal reentry after deportation for an aggravated felony, in violation of 8 U.S.C. § 1326(a), (b)(2) (2006). He received a within-Guidelines sentence of eighty-four months' imprisonment. On appeal, he argues his sentence is procedurally unreasonable because the district court misunderstood its authority to depart from the Guidelines range, and failed to provide sufficient explanation for its chosen sentence. He further argues his sentence is substantively unreasonable, alleging no empirical support for the illegal reentry Guideline and the Guideline's severity does

not relate **764** rationally to the offense levels established for other offenses. We vacate and remand for resentencing.

## I.

In the presentence report ("PSR"), the probation officer assigned Myers a base offense level of eight. *U.S. Sentencing Guidelines Manual § 2L1.2(a) (2009)*. Sixteen levels were added because at least one of Myers' prior convictions was for a drug trafficking offense for which the sentence imposed exceeded thirteen months. *See USSG § 2L1.2(b)(1)(A)*. After application of a three-level adjustment for acceptance of responsibility, Myers' resulting offense level was twenty-one. This offense level and a criminal history category of V generated an advisory Guidelines range of seventy to eighty-seven months' imprisonment.

Myers filed a sentencing memorandum in which he stated he had no objections to the PSR and stipulated that the Guidelines range had been properly calculated. However, based on various *18 U.S.C. § 3553(a)* factors, he requested a "sentence no greater than the low end of the [G]uideline[s] range." The Government responded and, citing to the *18 U.S.C. § 3553(a)* (2006) factors, requested a top-of-the-Guidelines sentence of eighty-seven months' imprisonment.

At sentencing, defense counsel again noted no objections to the PSR and asked the court "to impose a sentence no greater than 70 months." Counsel added, "I know that that's the low end of the recommended or Advisory Guidelines, but I still think it is appropriate." Counsel then proffered "three additional factors" in support of his written sentencing memorandum. First, he clarified that he was not objecting to the sixteen-level enhancement as it was appropriately applied under the Guidelines. However, he argued "there does not seem to be any empirical data or study conducted by the Sentencing Commission that would tie or directly relate to th[e] 16–level increase." While acknowledging that it was an argument that the district court heard and considered before, defense counsel suggested it was a factor the district court could take into consideration. Second, he maintained that the enhancement constituted double-counting as his prior convictions had already been taken into consideration in establishing his criminal history category. Again, he acknowledged that the Fourth Circuit has held that the enhancement is not considered double-counting, but urged the district court to at least consider it as a factor in determining an appropriate sentence. On these grounds, he

urged the district court to fashion a sentence "lower than the Advisory Guidelines Range." Third, he urged the district court to consider that the Fourth Circuit had not adopted a fast-tracking system, which affords defendants in border states up to a four-level departure. [1] Additionally, defense counsel cited to various *§ 3553(a)* factors, noting Myers was not in need of educational rehabilitative services as he is a skilled carpenter, that the need to promote respect for the law requires avoiding sentence disparities, and that Myers will be deported upon release. The Government, observing that defense counsel raised the arguments pertaining to the enhancement for the first time at sentencing, responded that Myers' arguments against application of the sixteen-level enhancement have repeatedly **765** been rejected by the Fourth Circuit. The Government added that the fast-tracking disparity argument too has been rejected by the Fourth Circuit and that, in any event, Myers would not qualify for the motion.

The district court rejected Myers' arguments under *§ 3553(a)* as meritless. With respect to his arguments concerning the sixteen-level enhancement, the district court stated:

> The bottom line is that this Offense Level of 21 is fully supported. The Fourth Circuit is clear about these arguments of double counting and that 16–point enhancement. And again, I am sitting here in the Fourth Circuit and I am not the King of the World. I cannot undo what they have done. Because I, unlike Mr. Myers, abide by the law.

> Now, so all of these objections or requests for some kind of lenient treatment flowing from these arguments will be rejected by the Court.

Accordingly, the district court sentenced Myers within the Guidelines range to eighty-four months' imprisonment.

## II.

A sentence is reviewed for reasonableness under an abuse of discretion standard. *Gall v. United States,* 552 U.S. 38, 51, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007). This review requires consideration of both the procedural and substantive reasonableness of a sentence. *Id.*; *see United States v. Lynn,* 592 F.3d 572, 575 (4th Cir.2010). A sentence imposed within the properly calculated Guidelines range is presumed reasonable by this Court. *United States v. Mendoza–Mendoza,* 597 F.3d 212, 217 (4th Cir.2010).

In determining the procedural reasonableness of a sentence, we consider whether the district court properly calculated the defendant's Guidelines range, treated the Guidelines as advisory, considered the 18 U.S.C. § 3553(a) (2006) factors, analyzed any arguments presented by the parties, and sufficiently explained the selected sentence. Gall, 552 U.S. at 51, 128 S.Ct. 586. "Regardless of whether the district court imposes an above, below, or within-Guidelines sentence, it must place on the record an individualized assessment based on the particular facts of the case before it." United States v. Carter, 564 F.3d 325, 330 (4th Cir.2009) (internal quotation marks omitted). Where, as here, the district court imposes a within-Guidelines sentence, the explanation may be "less extensive, while still individualized." United States v. Johnson, 587 F.3d 625, 639 (4th Cir.2009), cert. denied, ——— U.S. ———, 130 S.Ct. 2128, 176 L.Ed.2d 749 (2010). However, that explanation must be sufficient to allow for "meaningful appellate review" such that the appellate court need "not guess at the district court's rationale." Carter, 564 F.3d at 329–30 (internal quotation marks omitted).

Here, Myers does not dispute that the district court properly calculated his Guidelines range under the advisory Guidelines. Rather, he argues that the district court, relying on cases prior to the Supreme Court's decision in Kimbrough v. United States, 552 U.S. 85, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007), believed it did not have the authority to disagree with the Commission's policy behind the sixteen-level enhancement and impose a lower sentence on that basis.

The standard of review this court employs when reviewing the procedural adequacy of a sentence on appeal depends on whether the error was asserted in the district court. If the party properly preserved its claim, this court reviews for reasonableness under an abuse of discretion standard, reversing "unless ... the error was harmless." Lynn, 592 F.3d at 576, 578. The Government **766 argues that Myers' challenge to the procedural reasonableness of his sentence should be reviewed for plain error because he specifically requested a sentence within the advisory Guidelines range. Our review of the record discloses that defense counsel did in fact argue that the merit of Myers' challenge to the policy behind the sixteen-level enhancement was "reason enough that the Court can go below the Guidelines Range." We therefore conclude that Myers preserved his claim. See Lynn, 592 F.3d at 578 ("By drawing arguments from § 3553 for a sentence different than the one ultimately imposed, an aggrieved party sufficiently alerts the district court of

its responsibility to render an individualized explanation addressing those arguments, and thus preserves its claim."); cf. United States v. Hernandez, 603 F.3d 267, 270 (4th Cir.2010) (reviewing claim of procedural unreasonableness for plain error because defendant did not argue for a sentence different from the sentence that he received).

It is now well established that a court may consider policy objections to the Sentencing Guidelines. See Kimbrough, 552 U.S. at 101–07, 128 S.Ct. 558. In Kimbrough, the Supreme Court held that a district court may deviate from the advisory Guidelines range for crack cocaine offenses based on a conclusion that the disparity between ranges for crack and powder cocaine results in a sentence greater than necessary to achieve the sentencing goals of § 3553(a). 552 U.S. at 91, 128 S.Ct. 558.

In his sentencing memorandum, Myers posited no objections to the calculation of the Guidelines range; at sentencing, defense counsel again noted no objections to the Guidelines range. It is clear, however, that defense counsel sought to advance policy arguments mitigating application of the enhancement which the court in its discretion, under Kimbrough, could have espoused in fashioning Myers' sentence. In responding to Myers' argument, the district court stated that the Fourth Circuit was clear about arguments regarding the sixteen-level enhancement. Specifically, the district court judge pronounced he "could not undo what the Fourth Circuit has done." The record does not conclusively indicate that the district court was unaware of its authority to impose a variance sentence based on a disagreement with the policy behind the illegal reentry Guideline. Rather, in our view, the district court simply misconstrued Myers' argument as a direct challenge to the application of the sixteen-level enhancement in establishing Myers' Guidelines range. However, we conclude the record supports Myers' argument of procedural error with respect to his policy arguments for a downward variance.

Under a harmless error standard, the Government bears the burden of establishing that the error did not affect Myers' substantial rights. United States v. Robinson, 460 F.3d 550, 557 (4th Cir.2006). Specifically, the Government "may avoid reversal only if it demonstrates that the error did not have a substantial and injurious effect or influence on the result and we can say with fair assurance that the district court's explicit consideration of the defendant's arguments would not have affected the sentence imposed." United States v. Boulware, 604 F.3d 832, 838 (4th Cir.2010) (alterations and internal

quotation marks omitted). In its response, the Government states, "If the defendant had asked for a sentence *outside* the advisory guideline range, then perhaps the record might support the reading that the defendant tries to give it, but here the defendant made his challenge to the immigration guidelines *while asking for a sentence within the guideline range*."

**\*767** Because we review the procedural reasonableness of Myer's sentence for harmless error, Myers properly raised below policy arguments in support of a downward variance, the district court did not expressly adopt or reject those arguments instead noting it was bound by Fourth Circuit law, and the Government has not shown harmless error, we vacate Myers' judgment and remand for resentencing.[2] We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

*VACATED AND REMANDED.*

### Parallel Citations

2011 WL 3468288 (C.A.4 (Va.))

### Footnotes

1    "Fast-tracking refers to a procedure that originated in states along the United States–Mexico border, where district courts experienced high caseloads as a result of immigration violations." *United States v. Perez–Pena,* 453 F.3d 236, 238 (4th Cir.2006). In conformity with that practice, prosecutors seek to obtain pre-indictment pleas by offering to move for a downward departure under USSG § 5K3.1.

2    Of course, by this disposition, we indicate no opinion as to whether the eighty-four month sentence was substantively reasonable.

---

**End of Document**                                         © 2014 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext® © 2014 Thomson Reuters. No claim to original U.S. Government Works.     4

502 Fed.Appx. 284
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also Fourth
Circuit Rule 32.1 (Find CTA4 Rule 32.1)
United States Court of Appeals,
Fourth Circuit.

UNITED STATES of America, Plaintiff–Appellee,
v.
Bryan Keith NOEL, Defendant–Appellant.

No. 11–4283.   |   Argued: Oct. 24,
2012.   |   Decided: Dec. 28, 2012.

**Synopsis**
**Background:** Defendant was convicted in the United States
District Court for the Western District of North Carolina,
Richard L. Voorhees, J., 2011 WL 4836198, of conspiring to
commit mail fraud, multiple counts of mail fraud, conspiring
to commit money laundering, money laundering, multiple
counts of bank fraud, multiple counts of making false
statements to bank, and making false oath in bankruptcy
proceeding. He appealed.

**Holdings:** The Court of Appeals, Eagles, District Judge,
sitting by designation, held that:

[1] even assuming that district court erred in admitting brief
victim-impact testimony, error was harmless;

[2] admission of testimony of alleged co-conspirator who
had allegedly participated with defendant in scheme to
defraud investors did not violate defendant's Confrontation
Clause rights, though this alleged co-conspirator was taking
anti-anxiety medication that purportedly interfered with
defendant's ability to cross-examine him;

[3] prosecutor's closing argument, comparing defendant,
who lived in million-dollar home, with retirees whom he
defrauded of funds they had worked hard to save over period
of several years, did not, either by itself or in combination
with brief victim-impact evidence presented at trial, deprive
defendant of due process right to fair trial; and

[4] two-level enhancement in defendant's base offense
level for using sophisticated means was warranted,
notwithstanding that defendant did not use fictitious entities,
shell corporations, or offshore accounts.

Affirmed.

West Headnotes (4)

[1]   **Constitutional Law**
        👉 Other particular kinds or items of evidence
      **Criminal Law**
        👉 Evidence calculated to create prejudice
      against or sympathy for accused
      **Criminal Law**
        👉 Immaterial or incompetent evidence in
      general
      **Criminal Law**
        👉 Immaterial or incompetent evidence in
      general

      Even assuming that district court erred, in
      investment fraud prosecution, in admitting
      brief victim-impact testimony by retiree whom
      defendant allegedly defrauded, and who testified
      in tears about how she had nearly lost her
      home and her depression and thoughts of
      suicide, error was harmless beyond reasonable
      doubt and did not rise to level of due process
      violation, where testimony was extremely brief
      and was followed by cautionary instruction
      that jurors should not be swayed by sympathy
      or pity, jury heard extensive testimony about
      how defendant planned and executed scheme to
      defraud investors, and jurors actually acquitted
      defendant on one charge, thereby indicating that
      they were not unfairly influenced by passion or
      sympathy. U.S.C.A. Const.Amend. 5.

[2]   **Criminal Law**
        👉 Cross-examination and impeachment

      Admission of testimony of alleged co-
      conspirator who had allegedly participated with
      defendant in scheme to defraud investors did

not violate defendant's Confrontation Clause rights, though this alleged co-conspirator was taking anti-anxiety medication that purportedly interfered with defendant's ability to cross-examine him; defendant was given full and complete opportunity to cross-examine alleged co-conspirator in front of jury, and to question him about his mental health and effects of his medication, and there was nothing in record to indicate that this medication had effect of "screening" alleged co-conspirator from defendant. U.S.C.A. Const.Amend. 6.

**[3]**    **Constitutional Law**
👉 Prosecutor

**Constitutional Law**
👉 Cumulative errors

**Criminal Law**
👉 Appeals to Sympathy or Prejudice

**Criminal Law**
👉 Appeals to sympathy or prejudice

Prosecutor's closing argument in investment fraud prosecution, in which prosecutor compared defendant, who lived in million-dollar home, with retirees whom he defrauded of funds they had worked hard to save over period of several years and demanded that jurors provide defendant's victims with justice, did not, either by itself or in combination with brief victim-impact evidence presented at trial, deprive defendant of his due process right to fair trial; prosecutor's closing argument accurately summarized the evidence presented at trial and placed defendant's conduct in context, government presented strong evidence of defendant's guilt, and court had already instructed jurors to resist being swayed by sympathy. U.S.C.A. Const.Amend. 5.

**[4]**    **Sentencing and Punishment**
👉 Sophistication in commission or concealment

In investment fraud prosecution, two-level enhancement in defendant's base offense level for using sophisticated means was warranted, notwithstanding that defendant did not use

fictitious entities, shell corporations, or offshore accounts, where his three-year scheme had defrauded investors of millions of dollars, that defendant either lost in market or diverted for his personal benefit, while actively concealing nature of his activities by providing investors with fraudulent quarterly statements and letters, instructing his co-conspirator to do the same, and lying to two financial institutions in order to perpetuate and obscure the scheme. U.S.S.G. § 2B1.1(b)(9)(C), 18 U.S.C.A.

1 Cases that cite this headnote

**\*285** Appeal from the United States District Court for the Western District of North Carolina, at Asheville. Richard L. Voorhees, District Judge. (1:09–cr–00057–RLV–1).

**Attorneys and Law Firms**

**ARGUED:** Ann Loraine Hester, Federal Defenders of Western North Carolina, INC., Charlotte, North Carolina, for Appellant. Melissa Louise Rikard, Office of the United States Attorney, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Henderson Hill, Executive Director, Federal Defenders of Western North Carolina, Inc., Charlotte, North Carolina, Matthew Segal, Allison Wexler, Federal Defenders of Western North Carolina, **\*286** Inc., Asheville, North Carolina, for Appellant. Anne M. Tompkins, United States Attorney, Charlotte, North Carolina, for Appellee.

Before DAVIS and FLOYD, Circuit Judges, and CATHERINE C. EAGLES, United States District Judge for the Middle District of North Carolina, sitting by designation.

**Opinion**

Affirmed by unpublished opinion. Judge EAGLES wrote the opinion, in which Judge DAVIS and Judge FLOYD joined.

Unpublished opinions are not binding precedent in this circuit.

EAGLES, District Judge:

A jury convicted Bryan Keith Noel of conspiracy to commit mail fraud, multiple counts of mail fraud, conspiracy to commit money laundering, money laundering, multiple counts of bank fraud, multiple counts of making false

statements to a bank, and making a false oath in a bankruptcy proceeding. J.A. 2192–93, 2460. Noel was sentenced to 300 months' imprisonment. J.A. 2453, 2461. On appeal, Noel challenges two evidentiary rulings, the propriety of the prosecutor's remarks during closing arguments, and a sentencing enhancement. Finding no reversible error, we affirm.

## I.

### A.

Noel's convictions in large part stem from an investment fraud scheme. The government alleged that, between 2003 and 2006, Noel recruited retirees to invest more than $10 million with his estate planning company, Certified Estate Planners ("CEP"), by assuring them that their funds would be invested in small-cap stocks and that the investments were low-risk. J.A. 252–54, 372.

Although Noel consistently provided the investors with quarterly statements indicating favorable returns, J.A. 281–82, 333–40, 376–77, 420–23, 650–52, 654–58, 744–45, 751, their investments were generally unsuccessful. J.A. 985. In early 2002, Noel agreed to offer a stock trading program developed by Alexander Klosek, who was employed by CEP as an independent trustee and accountant. J.A. 817, 820, 828–30. The program went well for several months, but it began sustaining substantial losses by June 2002. J.A. 842. Klosek did not tell Noel about the losses. J.A. 842–44, 853–60.

In 2003, Noel began borrowing money from CEP's investor funds to pay for his start-up mining business, including $2 million to purchase a factory in Tennessee. J.A. 861–65, 872. Noel and Klosek agreed to conceal the loan from the investors. J.A. 875, 879–80, 915–16, 934, 1168. Noel continued to borrow money from CEP to fund his start-up companies until 2006, totaling an additional $2 million. J.A. 467, 474, 889, 903–04, 906–07, 912–13, 1360–63, 2270–74. In 2005, Klosek told Noel about the losses sustained as a result of the stock trading program. J.A. 985–91. Noel continued to issue positive quarterly statements. J.A. 333, 337, 423, 893–96, 1718–19, 2223.

Of the over $10 million invested by CEP clients, approximately $2 million were lost in stock market trades and more than $4 million were diverted to Noel's start-ups before CEP's collapse in August 2006. J.A. 1348, 1369, 1406,

1979, 2267, 2275, 2359. When the government seized CEP's accounts in August 2006, only $997,630.20 remained. J.A. 1375.

### B.

Noel's bank fraud convictions arose from Noel's fraudulent statements on two loan applications. In late 2005, one of Noel's **\*287** start-up companies applied for and received a $1.25 million loan from Carolina First Bank. J.A. 1001, 1474–75, 1479, 1504, 1805, 1826. The stated purposes of the loan were to repay an earlier loan from Carolina First and to purchase equipment. J.A. 1475, 1479, 1504, 1805, 1826. Noel signed the loan on behalf of his start-up. J.A. 1504. Noel and Klosek actually invested the money in the stock market, hoping to make enough to repay CEP for the funds Noel had routed to his start-ups. J.A. 1001–15, 1453. The investments were unsuccessful, and Noel again sustained substantial losses. J.A. 1006–07, 1018–20, 1196, 1970–74, 2368.

In August 2006, Noel sought to refinance his home. J.A. 1511–12. In his loan application, Noel falsely stated that he was not a defendant to any lawsuit. J.A. 1322, 1381–82. Noel also certified that his income was $23,000 per month. J.A. 1517, 1530, 1538, 1993–97. However, on his later-filed bankruptcy petition, Noel reported his 2006 income as $150,000; on his 2006 tax return, he reported $154,783. J.A. 1447, 1993–97.

### C.

Noel's bankruptcy fraud convictions stemmed from false statements he made on his August 2007 bankruptcy petition. Despite owning a 2007 BMW with a purchase price of $72,890 and a $1000 assault rifle, Noel listed only a 1997 Ford truck valued at $3500 and only $100 in sporting goods. J.A. 1631–34, 1654, 1683, 1685–86, 1688.

## II.

[1]    On appeal, Noel first contends that the district court erred in admitting testimony from four CEP investors about the effects of their financial losses, rendering his trial fundamentally unfair under the Due Process Clause of the Fifth Amendment. The victims testified over defense

objections that after losing the money they invested with CEP, they could not pay off their mortgages, had to sell their homes, and had to work despite having saved for retirement. J.A. 283–84, 388–89, 638–39. The government's final witness, Carol Odegaard, testified in tears that she almost lost her home, became depressed, had thoughts of suicide, and could not afford her medication. J.A. 1720–21.

We review preserved evidentiary rulings for abuse of discretion and will only reverse a ruling that is "arbitrary and irrational." *United States v. Cloud,* 680 F.3d 396, 401 (4th Cir.2012) (internal quotation marks omitted). Under Rule 52(a) of the Federal Rules of Criminal Procedure, evidentiary rulings are subject to harmless error review, "such that 'in order to find a district court's error harmless, we need only be able to say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.' " *United States v. Johnson,* 617 F.3d 286, 292 (4th Cir.2010) (quoting *United States v. Brooks,* 111 F.3d 365, 371 (4th Cir.1997)).

The testimony about the victims' financial losses was relevant to prove intent to defraud. *Cloud,* 680 F.3d at 402; *see also United States v. Copple,* 24 F.3d 535, 545 (3d Cir.1994) ("Proving specific intent in mail fraud cases is difficult, and, as a result, a liberal policy has developed to allow the government to introduce evidence that even peripherally bears on the question of intent. Proof that someone was victimized by the fraud is thus treated as some evidence of the schemer's intent." (internal citations omitted)). Even Odegaard's testimony about her mental health was offered in the context of explaining the financial consequences of the fraud and her inability to pay for her prescription medicine. This testimony was extremely brief and was followed by a cautionary **\*288** instruction not to be swayed by sympathy or pity.

Even assuming that the district court erred in admitting Odegaard's testimony, the error was harmless and did not rise to the level of a due process violation. The jury heard extensive testimony from Klosek that Noel planned and executed a scheme to defraud the investors. Several victims testified as to what Noel said would be done with their money and what actually happened to it. The government presented documentary evidence of the losses contrasted with letters in which Noel assured CEP clients that their investments were thriving. The brief victim-impact testimony "was therefore cumulative and did not have a substantial or injurious effect

on the jury's verdict." *United States v. DeLeon,* 678 F.3d 317, 328 (4th Cir.2012). Additionally, Noel was acquitted on one charge, indicating the jury was not unfairly influenced by passion or sympathy. Thus, we are confident that the jury's guilty verdicts were not attributable to any error in admitting the victim-impact testimony. *See Sullivan v. Louisiana,* 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).

## III.

[2] Noel also argues that the district court erred in admitting Klosek's testimony because Klosek was taking anti-anxiety medication. Noel contends that the testimony violated the Sixth Amendment's Confrontation Clause because the medication acted as a "screen" that deprived Noel of a meaningful opportunity for confrontation and cross-examination.

Because defense counsel did not object at trial with a reasonable degree of specificity as to the Confrontation Clause violation, objecting instead on competency grounds, this claim is subject to plain error review. *See* Fed.R.Evid. 103(a); *United States v. Parodi,* 703 F.2d 768, 783 (4th Cir.1983) ("The mandate for specificity in the Rule imposes upon the objecting party the obligation to object with that reasonable degree of specificity which would have adequately apprised the trial court of the true basis for his objection; and would have clearly stated the specific ground now asserted on appeal." (internal quotation marks, citations, and alteration omitted)). Accordingly, we will reverse only if Noel demonstrates error that was plain and affected his substantial rights. *United States v. Mackins,* 315 F.3d 399, 408 (4th Cir.2003).

The Confrontation Clause protects a defendant's right to face witnesses who testify against him and his right to conduct cross-examination. *See Pennsylvania v. Ritchie,* 480 U.S. 39, 51, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987); *United States v. Jinwright,* 683 F.3d 471, 482–83 (4th Cir.2012). There is nothing in the record to indicate that Klosek's medication had the effect of "screening" Klosek from Noel. *See Coy v. Iowa,* 487 U.S. 1012, 1020–21, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988) (holding that a witness's testimony, given from behind a screen designed to block the witness's view of the defendant, violated the defendant's right to a face-to-face encounter). Further, Noel was given a full and complete opportunity to cross-examine Klosek in front of the jury, including questions about his mental health and the effects of his medication.

Accordingly, we hold that the district court did not err in permitting Klosek to testify.

## IV.

[3] Noel next challenges the government's closing argument. Specifically, Noel objects to what he characterizes as the prosecutor's (1) call for justice; (2) comparison of Noel to the victims; and (3) call for the jury to "do the right thing."

**\*289** In the government's closing argument, after summarizing the fraud schemes, counsel closed with the following:

> While John Thomas worked for years as a lineman in the Wisconsin winters and the hot Midwest summers saving up so he and his wife could hike and travel in the final years of their retirement, it took Mr. Noel one seminar, one meeting, one wire transfer, and one big lie to take half of it away and to buy himself a factory....
>
> While Ms. O' Ryan worked hard as a single mom and as a teacher saving up so her daughter could go to medical school Mr. Noel had other ideas for her money. She never even heard of [Noel's start-up companies] until it was too late.
>
> While Mr. Emme and his wife lived under their means for 30 plus years saving up for retirement Mr. Noel was using their money to buy a factory ..., to fund [one of his start-ups], buying five BMWs in five years, refinancing his million-dollar home, and hiding his $73,000 BMW, his expensive firearm, and $200,000 in income from the federal bankruptcy court.
>
> It's been an endless stream of lies, members of the jury. But now it is time for the truth. It is time for you to hold Mr. Noel accountable. It is time for you to give these people justice. It is time to find the truth. It is time to find him guilty.

J.A. 2093–94. During the government's rebuttal, counsel stated

> We're asking for it to finish right. These people were wronged. They were lied to repeatedly. They were defrauded. They were subjected to a scheme to defraud, as was the bankruptcy court, as was JP Morgan

Bank, as was Carolina First Bank, and what we are asking you to do is to end it right, to finish it right, to do the right thing.

J.A. 2134.

Because Noel did not object to the prosecutor's remarks, we review this claim for plain error. *See United States v. Loayza,* 107 F.3d 257, 262 (4th Cir.1997).

"[P]rosecutors enjoy considerable latitude in presenting arguments to a jury because the adversary system permits the prosecutor to prosecute with earnestness and vigor." *Bates v. Lee,* 308 F.3d 411, 422 (4th Cir.2002) (internal quotation marks and citations omitted). A prosecutor's remarks may violate a defendant's due process rights, however, if the remarks were (1) improper; and (2) so prejudiced the defendant's substantial rights that he was denied a fair trial. *United States v. Wilson,* 624 F.3d 640, 656 (4th Cir.2010). In assessing prejudice, we consider:

> (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters; (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel; and (6) whether curative instructions were given to the jury.

*Id.* at 656–57.

The prosecutor's comments were not improper and did not deny Noel a fair trial. When a crime has a victim, it is not improper to point that out to the jury. The argument accurately summarized the evidence presented at trial and placed Noel's conduct in context. Moreover, the government presented strong evidence of Noel's guilt, and the court had already instructed **\*290** the jury to resist being swayed by sympathy for the victims.

Having found no reversible error in the admission of evidence or the government's closing argument, we also reject Noel's proposition that, combined, the victim-impact testimony and the government's closing argument warrant reversal pursuant to the cumulative error doctrine. Faced with strong evidence against Noel and a fundamentally fair trial, we conclude that cumulatively there is no error.

## V.

 [4]    Finally, Noel claims that the district court committed procedural sentencing error by imposing a two-level sophisticated means enhancement pursuant to *U.S. Sentencing Guidelines Manual* ("USSG") § 2B1.1(b)(9)(C) (2009), and a two-level sophisticated laundering enhancement, pursuant to USSG § 2S1.1(b)(3). In reviewing a district court's guidelines calculation, "including its application of any sentencing enhancements, this Court reviews the district court's legal conclusions *de novo* and its factual findings for clear error." *United States v. Horton,* 693 F.3d 463, 474 (4th Cir.2012). We thus review for clear error the district court's finding that Noel used sophisticated means.

Section 2B1.1(b)(9)(C) of the 2009 guidelines provides for a two-level sentencing enhancement if the offense "involved sophisticated means," which is defined as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." USSG § 2B1.1 cmt. n. 8(B). Likewise, USSG § 2S1.1(b)(3) applies a two-level enhancement where a money laundering offense "involved sophisticated laundering," similarly defined as "complex or intricate offense conduct pertaining to the execution or concealment of the 18 U.S.C. § 1956 offense." USSG § 2S1.1 cmt. n. 5(A).

Noel essentially argues that his conduct was not intricate or complex enough to warrant sophistication enhancements because he did not use fictitious entities, shell corporations, or offshore accounts. However, each of a defendant's individual actions need not be sophisticated to warrant a

sophisticated means enhancement. *See Jinwright,* 683 F.3d at 486 (applying USSG § 2T1.1(b)(2) tax fraud sophisticated means enhancement); *United States v. Snow,* 663 F.3d 1156, 1163–64 (10th Cir.2011) (applying USSG § 2B1.1(b)(9)(C)); *United States v. Ghertler,* 605 F.3d 1256, 1267–68 (11th Cir.2010) (same); *United States v. Wayland,* 549 F.3d 526, 529 (7th Cir.2008) (same).

The district court found application of § 2B1.1(b)(9)(C) and § 2S1.1(b)(3) was appropriate in light of the "intricate web of representations and manipulations and maneuverings" Noel created to hide the scheme from his investors. J.A. 2398. This finding was supported by substantial evidence. Over a three-year period, Noel attracted CEP clients by assuring them that he would invest their money safely and took money from those investors to fund his own start-up companies. Meanwhile, Noel intentionally informed the investors through quarterly statements and letters, as well as in person, that their money was producing well, and Noel instructed Klosek to do the same. Noel also lied to two financial institutions in order to perpetuate and obscure the scheme. Noel's three-year period of extensive, intentional concealment is the kind of scheme anticipated by the enhancements. *See, e.g., United States v. Sheneman,* 682 F.3d 623, 631–32 (7th Cir.2012); *Snow,* 663 F.3d at 1164; *United States v. Fiorito,* 640 F.3d 338, 351 (8th Cir.2011). Thus, we conclude that the district court did not err in applying sophisticated means and laundering enhancements.

## *291 VI.

For the reasons stated, we affirm Noel's conviction and sentence.

*AFFIRMED.*

## Parallel Citations

2012 WL 6720918 (C.A.4 (N.C.))

---

**End of Document**    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

392 Fed.Appx. 138
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also Fourth
Circuit Rule 32.1 (Find CTA4 Rule 32.1)
United States Court of Appeals,
Fourth Circuit.

UNITED STATES of America, Plaintiff-Appellee,
v.
Grady Lee RUSHING, Defendant-Appellant.

No. 09-5036.    |    Submitted: July
29, 2010.    |    Decided: Aug. 20, 2010.

**Synopsis**
**Background:** Defendant pled guilty in the United States
District Court for the Western District of North Carolina,
Martin K. Reidinger, J., to possession with intent to distribute
five grams or more of cocaine base, and was sentenced to
the mandatory minimum term of 60 months' imprisonment.
Defendant appealed.

**Holding:** The Court of Appeals held that defendant's sentence
was procedurally reasonable.

Affirmed.

West Headnotes (1)

**[1]**    **Sentencing and Punishment**
        👉 **Sufficiency**

Defendant's sentence of the mandatory minimum
term of 60 months' imprisonment after pleading
guilty to possession with intent to distribute
five grams or more of cocaine base was not
procedurally unreasonable; district court offered
a thorough discussion of the statutory sentencing
factors that informed its decision to impose
the minimum sentence mandated by statute. 18
U.S.C.A. § 3553(a).

**\*139**  Appeal from the United States District Court for the
Western District of North Carolina, at Charlotte. Martin K.
Reidinger, District Judge. (3:08-cr-00192-MR-1).

**Attorneys and Law Firms**

Randolph M. Lee, Charlotte, North Carolina, for Appellant.

Adam Christopher Morris, Office of the United States
Attorney, Charlotte, NC, for Appellee.

Before MOTZ and SHEDD, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

**Opinion**

Affirmed by unpublished PER CURIAM Opinion.

Unpublished opinions are not binding precedent in this
circuit.

PER CURIAM:

Pursuant to a plea agreement, Grady Lee Rushing pled guilty
to possession with intent to distribute five grams or more of
cocaine base, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)
(2006). The district court sentenced Rushing to the mandatory
minimum term of sixty months' imprisonment.

Rushing's attorney has filed a brief pursuant to *Anders v.
California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493
(1967), stating that, in his view, there are no meritorious
grounds for appeal, but suggesting that the district court's
reliance on the statutory mandatory minimum renders
Rushing's sentence procedurally unreasonable. Rushing has
filed a pro se supplemental brief in which he raises the
same issue and challenges the adequacy of the district court's
explanation for his sentence. For the reasons that follow, we
affirm the district court's judgment.

Post-*Booker,* [1] this court reviews a sentence for
reasonableness, applying an abuse of discretion standard.
*Gall v. United States,* 552 U.S. 38, 51, 128 S.Ct. 586, 169
L.Ed.2d 445 (2007); *see also United States v. Layton,* 564
F.3d 330, 335 (4th Cir.), *cert. denied,* --- U.S. ----, 130
S.Ct. 290, 175 L.Ed.2d 194 (2009). This review requires
appellate consideration of both the procedural and substantive

reasonableness of a sentence. *Gall,* 552 U.S. at 51, 128 S.Ct. 586. In determining procedural reasonableness, we consider whether the district court properly calculated the defendant's advisory Guidelines range, considered the 18 U.S.C. § 3553(a) (2006) factors, analyzed any arguments presented by the parties, and sufficiently explained the selected sentence. *Gall,* 552 U.S. at 51, 128 S.Ct. 586. "Regardless of whether the district court imposes an **\*140** above, below, or within-Guidelines sentence, it must place on the record an individualized assessment based on the particular facts of the case before it." *United States v. Carter,* 564 F.3d 325, 330 (4th Cir.2009) (internal quotation marks omitted). If we find "no significant procedural error," we next assess the substantive reasonableness of the sentence, taking " 'into account the totality of the circumstances, including the extent of any variance from the Guidelines range.' " *United States v. Morace,* 594 F.3d 340, 346-47 (4th Cir.2010) (quoting *Gall,* 552 U.S. at 51, 128 S.Ct. 586).

Both counsel and Rushing advance that the sixty-month sentence is procedurally unreasonable because it was based on a purportedly unconstitutional statutory mandatory minimum. We disagree. As the Supreme Court recognized in *Kimbrough v. United States,* 552 U.S. 85, 108, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007), although sentencing courts are free, post-*Booker,* to reject the 100:1 crack cocaine/powder cocaine ratio in terms of a defendant's Guidelines range, they are nonetheless "constrained by the mandatory minimums Congress prescribed." Furthermore, this issue is foreclosed by Circuit precedent that has not been overruled. *See United States v. Perkins,* 108 F.3d 512, 518-19 (4th Cir.1997) (rejecting equal protection challenge to the disparate statutory mandatory minimums applicable to crack cocaine and powder

cocaine offenses); *United States v. Fisher,* 58 F.3d 96, 99-100 (4th Cir.1995) (rejecting due process challenge to same).

We also reject Rushing's contention that the district court failed to adequately explain the sentence it imposed. The district court offered a thorough discussion of the § 3553(a) sentencing factors that informed its decision to impose the minimum sentence mandated by statute. *See United States v. Lynn,* 592 F.3d 572, 576 (4th Cir.2010) Accordingly, we hold that Rushing's sentence is procedurally reasonable. [2]

In accordance with *Anders,* we have reviewed the entire record for any meritorious issues and have found none. The district court complied with the mandates of Federal Rule of Criminal Procedure 11 in accepting Rushing's guilty plea. Accordingly, we affirm the district court's judgment. This court requires that counsel inform his client, in writing, of his right to petition the Supreme Court of the United States for further review. If the client requests that a petition be filed, but counsel believes that such a petition would be frivolous, then counsel may move in this court for leave to withdraw from representation. Counsel's motion must state that a copy thereof was served on the client. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

*AFFIRMED.*

### Parallel Citations

2010 WL 3279206 (C.A.4 (N.C.))

---

Footnotes

1    *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

2    We also afford Rushing's within-Guidelines sentence a presumption of substantive reasonableness. *See United States v. Wright,* 594 F.3d 259, 267 (4th Cir.2010); *see also Rita v. United States,* 551 U.S. 338, 347, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007) (upholding rebuttable presumption of reasonableness for within-Guidelines sentence).

---

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

465 Fed.Appx. 278
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also Fourth
Circuit Rule 32.1 (Find CTA4 Rule 32.1)
United States Court of Appeals,
Fourth Circuit.

UNITED STATES of America, Plaintiff–Appellee,
v.
Linda Lea SADR, Defendant–Appellant.

No. 11–4693.    |    Submitted: Jan.
27, 2012.    |    Decided: Feb. 14, 2012.

**Synopsis**
**Background:** Defendant was convicted of mail fraud, wire
fraud, and money laundering, following entry of guilty plea
in the United States District Court for the Eastern District of
Virginia, Liam O'Grady, J., and was sentenced to 144 months'
imprisonment. Defendant appealed sentence.

**Holdings:** The Court of Appeals held that:

[1] four-level adjustment for offense involving large number
of vulnerable victims was warranted, and

[2] application of two-level sophisticated means enhancement
was warranted.

Affirmed.

West Headnotes (2)

[1]    **Sentencing and Punishment**
       👉 Vulnerability of victim

       Application of four-level adjustment for offense
       involving large number of vulnerable victims
       was warranted in sentencing defendant for mail
       fraud, wire fraud, and money laundering in
       transaction exceeding $10,000, where many

of defendant's victims were immigrants who
spoke no English or were not entirely fluent in
English, and two significant emails defendant
sent suggested that she preferred such clients.
18 U.S.C.A. §§ 2, 1341, 1343, 1957; U.S.S.G. §
3A1.1(b), 18 U.S.C.A.

[2]    **Sentencing and Punishment**
       👉 Sophistication in commission or
       concealment

       Application of two-level sophisticated means
       enhancement was warranted in sentencing
       defendant for mail fraud, wire fraud, and money
       laundering in transaction exceeding $10,000,
       where defendant created variety of businesses,
       including her own title company, which she used
       to cover fact that her victims' mortgages were not
       in process of being eliminated, as she promised,
       fees she collected were simply being used to
       make mortgage payments for other participants,
       and when defendant stopped making mortgage
       payments, she created corporation, falsely
       claimed that it had bought another of her
       companies, and that corporation was slowing
       processing of payments. 18 U.S.C.A. §§ 2,
       1341, 1343, 1957; U.S.S.G. § 2B1.1(b)(9)(C), 18
       U.S.C.A.

**\*279** Appeal from the United States District Court for the
Eastern District of Virginia, at Alexandria. Liam O'Grady,
District Judge. (1:10–cr–00437–LO–1).

**Attorneys and Law Firms**

Michael S. Nachmanoff, Federal Public Defender, Kevin
Brehm, Assistant Federal Public Defender, Caroline S. Platt,
Appellate Attorney, Alexandria, Virginia, for Appellant.
Neil H. MacBride, United States Attorney, Marla B. Tusk,
Assistant United States Attorney, Alexandria, Virginia, for
Appellee.

Before KING, KEENAN, and DIAZ, Circuit Judges.

**Opinion**

Affirmed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Linda Lea Sadr pled guilty to two counts of mail fraud, 18 U.S.C.A. §§ 1341, 2 (West Supp.2011); four counts of wire fraud, 18 U.S.C. §§ 1343, 2 (2006); and two counts of money laundering in a transaction exceeding $10,000, in violation of 18 U.S.C. §§ 1957, 2 (2006). She received a sentence of 144 months' imprisonment. Sadr appeals her sentence, contending that the district court clearly erred in making a four-level adjustment for an offense involving a large number of vulnerable victims, *U.S. Sentencing Guidelines Manual § 3A1.1(b) (2010)*, and a two-level enhancement for use of sophisticated means, *see U.S.S.G. § 2B1.1 (b)(9)(C)*. We affirm.

We review a sentence for reasonableness under an abuse of discretion standard. *Gall v. United States,* 552 U.S. 38, 51, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007), which requires consideration of both the procedural and substantive reasonableness of a sentence. *Id.; see United States v. Lynn,* 592 F.3d 572, 575 (4th Cir.2010). We first review the sentence for significant procedural error, including whether the district court properly calculated the defendant's Guidelines range, treated the Guidelines as advisory, considered the 18 U.S.C. § 3553(a) factors, analyzed any arguments presented by the parties, and sufficiently explained the selected sentence. *Gall,* 552 U.S. at 51, 128 S.Ct. 586. If there are no significant procedural errors, we consider the substantive reasonableness of the sentence, taking into account the totality of the circumstances. *United* **\*280** *States v. Mendoza–Mendoza,* 597 F.3d 212, 216–17 (4th Cir.2010).

Sadr worked in the real estate business in northern Virginia for a number of years. She worked as a loan officer for several mortgage companies and also operated a series of her own companies, through which she represented that she could help homeowners quickly eliminate their home mortgages by means of her "mortgage elimination" or "mortgage challenge" program. Her program was premised on the idea that lenders funding refinance loans were operating illegally and could be sued, thereby forcing them to release mortgages in full. Sadr also offered to invest her clients' money, promising a high rate of return. None of these promises were kept, although Sadr paid off a few of her clients' mortgages, leading them to believe that they had successfully completed her program. These clients then helped her recruit others

into her scheme. Many of her clients lost their homes to foreclosure and lost the money they invested with her.

**[1]** Guidelines section 3A1.1(b) provides a two-level adjustment under subsection (b)(1), which applies "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim," and an additional two-level increase under subsection (b)(2), which applies if the offense involved a large number of vulnerable victims. Before making the adjustment, the court must first determine that a victim was "unusually vulnerable due to age, physical or mental condition, or ... otherwise particularly susceptible to the criminal conduct." USSG § 3A1.1 cmt. n. 2; *see United States v. Llamas,* 599 F.3d 381, 388 (4th Cir.2010). The court must also find that the defendant knew or should have known of the victim's unusual vulnerability. [*] *Id.* Because the court's determination is factual, it is reviewed for clear error. *Id.*

Sadr argues that the government failed to show that any of the fraud victims were unusually vulnerable or particularly susceptible to her criminal scheme. Thus, she contends that the government failed to show that she knew or should have known of her victims' unusual vulnerability or susceptibility, and that the government failed to show that the offense involved a large number of vulnerable victims.

However, the record reveals that many of Sadr's victims were immigrants who spoke no English or were not entirely fluent in English, and two significant emails she sent suggested that she preferred such clients. We conclude that the evidence before the district court was sufficient to support a finding by a preponderance of the evidence that the enhancement applied, and that the district court did not clearly err in applying it. *Llamas* and the commentary to § 3A1.1(b) (2) do not require that all victims be unusually vulnerable or susceptible to the fraud, only that a large number of them qualify. In this case, a lack of familiarity with "non-conversational English" disadvantaged many of Sadr's victims by making them less able to understand the suspicious nature of Sadr's sales pitch or the program she proposed to them.

**[2]** Section 2B1.1(b) (9)(C) of the Guidelines provides for a two-level enhancement to a defendant's offense level if "the offense ... involved sophisticated means." The enhancement applies when a defendant employs "especially complex or **\*281** especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 cmt. n. 8(B). Examples of sophisticated means include

"hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." *Id.* A defendant's offense of conviction may involve "sophisticated means" even if not every aspect of his scheme was complex or intricate. *United States v. Edelmann,* 458 F.3d 791, 816 (8th Cir.2006); *see also United States v. Weiss,* 630 F.3d 1263, 1279 (10th Cir.2010) ("The Guidelines do not require every step of the defendant's scheme to be particularly sophisticated; rather, as made clear by the Guidelines' commentary, the enhancement applies when the execution or concealment of a scheme, viewed as a whole, is especially complex or especially intricate." (internal quotation marks omitted)); *United States v. Ghertler,* 605 F.3d 1256, 1267 (11th Cir.2010) (no requirement that defendant's individual actions be sophisticated).

Sadr contends that hers was a garden-variety mortgage fraud in which she used companies and accounts that were all openly linked to her and to addresses where she could be reached. However, Sadr created a variety of businesses, including her own title company, which she used to cover the fact that her victims' mortgages were not in the process of being eliminated, as she promised, and that the fees she collected were simply being used to make mortgage payments for other participants. When Sadr stopped making mortgage payments, she created Property Logistics, Inc., falsely claimed that it had bought another of her companies, Maximum Impact, and that Property Logistics, Inc. was slowing the processing of payments. After the mortgage payments stopped and participants began receiving foreclosure notices, the participants were unable to locate Sadr because none of her companies occupied a physical space and she had stopped answering emails. We conclude that application of the enhancement in her case was not clearly erroneous.

We therefore affirm the sentence imposed by the district court. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

*AFFIRMED.*

### Parallel Citations

2012 WL 453651 (C.A.4 (Va.))

Footnotes

*      The adjustment currently does not require that the defendant have targeted the victim specifically because of his vulnerability, although before the 1995 amendment to § 3A1.1, Application Note 2 stated that the adjustment "applies to offenses where an unusually vulnerable victim is made a target of criminal activity by the defendant." *See* app. C, amend. 521.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

ADDENDUM B

# RULE 28 (F) ADDENDUM

## United States Sentencing Guideline Manual § 2B1.1(b)(1)(H) (2001)

CHAPTER TWO - OFFENSE CONDUCT
PART B - BASIC ECONOMIC OFFENSES
1. THEFT, EMBEZZLEMENT, RECEIPT OF STOLEN PROPERTY,
PROPERTY DESTRUCTION, AND OFFENSES INVOLVING FRAUD OR
DECEIT

Application Note 3(F)(i):

*(i)     Stolen or Counterfeit Credit Cards and Access Devices; Purloined Numbers and Codes.—In a case involving any counterfeit access device or unauthorized access device, loss includes any unauthorized charges made with the counterfeit access device or unauthorized access device and shall be not less than $500 per access device.  However, if the unauthorized access device is a means of telecommunications access that identifies a specific telecommunications instrument or telecommunications account (including an electronic serial number/mobile identification number (ESN/MIN) pair), and that means was only possessed, and not used, during the commission of the offense, loss shall be not less than $100 per unused means.  For purposes of this subdivision, "counterfeit access device" and "unauthorized access device" have the meaning given those terms in Application Note 9(A).*

Application Note 9(A) (selected definitions):

*"Counterfeit access device" (i) has the meaning given that term in 18 U.S.C. § 1029(e)(2); and (ii) includes a telecommunications instrument that has been modified or altered to obtain unauthorized use of telecommunications service.*

*"Unauthorized access device" has the meaning given that term in 18 U.S.C. § 1029(e)(3).*

## 18 U.S.C. § 1029(e)(1)-(3) (2014) (selected definitions)

*(e) As used in this section--*

*(1) the term "access device" means any card, plate, code, account number, electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument);*

*(2) the term "counterfeit access device" means any access device that is counterfeit, fictitious, altered, or forged, or an identifiable component of an access device or a counterfeit access device;*

*(3) the term "unauthorized access device" means any access device that is lost, stolen, expired, revoked, canceled, or obtained with intent to defraud;*